**SO ORDERED**

**SIGNED this 5 day of January, 2024.**

_____
**Pamela W. McAfee**
**United States Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

| IN RE:<br>**9 METERS BIOPHARMA, INC.,**<br>DEBTOR | CASE NO. 23-01992-5-PWM<br>CHAPTER 7 |
| --- | --- |
| **ORDER (I) APPROVING ASSET PURCHASE AGREEMENT,<br>(II) AUTHORIZING THE SALE OF THE DEBTOR'S ASSETS<br>FREE AND CLEAR OF ALL ENCUMBRANCES TO HELICORE BIOVENTURES I,<br>INC., (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN<br>EXECUTORY CONTRACTS AND UNEXPIRED LEASES,<br>AND (IV) GRANTING RELATED RELIEF** | |

This matter comes before the Court on the Motion (the "**Motion**") of George F. Sanderson III, Chapter 7 Trustee for the Bankruptcy Estate of 9 Meters Biopharma, Inc. ("**9 Meters**" or "**Debtor**"), as amended [D.E. #84, 96, 111] for the entry of an order (the "**Order**"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Eastern District of North Carolina (the "**Local Rules**"): (i) approving that certain asset purchase agreement, dated as of **January 5, 2024**, by and among the

Trustee as Seller,[1] and Helicore Bioventures, I, a Delaware corporation, as Buyer ("**Buyer**") (including all exhibits, annexes and schedules related thereto, and as the same may be amended from time to time in accordance with the terms thereof, the "**Purchase Agreement**"), a copy of which is attached hereto as **Exhibit A**, (ii) authorizing and approving the sale of certain of the Debtor's assets (as more precisely defined in the Purchase Agreement, the "**Purchased Assets**"), free and clear of claims, liens, encumbrances, and other interests, and the consummation of all other transactions contemplated by the Purchase Agreement (collectively, the "**Sale**"), (iii) authorizing and approving the assumption and assignment of the Debtor's Assigned Contracts as set forth in the Purchase Agreement, and (iv) granting related relief; the United States Bankruptcy Court for the Eastern District of North Carolina (the "**Court**") having entered on November 29, 2023 that certain *Order (I)(A) Approving Bidding Procedures for Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and Designating Incregen Therapeutics LLC as a Stalking Horse Bidder, (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (II) Granting Related Relief* [D.E. #116] (the "**Bidding Procedures Order**"); the Trustee having determined that the highest or otherwise best offer for the Purchased Assets was made by the Buyer pursuant to the Purchase Agreement; the Court having conducted a hearing on January 5, 2024 (the "**Sale Hearing**"), at

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement, as applicable.

which all parties in interest were offered an opportunity to be heard with respect to the Motion, to consider approval of the Sale pursuant to the terms and conditions of the Purchase Agreement; and the Court having considered (i) the Motion, all objections thereto, and all replies in support thereof, (ii) the arguments of counsel made, and evidence proffered or adduced, related to the Motion, (iii) all oral and written statements in support of the Sale at the hearing to consider approval of the Bidding Procedures Order and at the Sale Hearing by parties in interest; and (iv) the full record of the bankruptcy proceeding, including the record related to the hearing to consider the approval of the Bidding Procedures Order (and the Bidding Procedures as defined in the Bidding Procedures Order) and the Sale Hearing; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Purchase Agreement and the Sale and the related relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtor's estate, the Debtor's creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED:**[2]

**Jurisdiction, Final Order and Statutory Predicates**

A.     The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the Order of Referral of

---

[2]   All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

Bankruptcy Matters to Bankruptcy Judges.  The Motion is a core proceeding under 28 U.S.C. § 157(b).  The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution.  Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory bases for the relief requested in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, thus, waives any stay and expressly directs that this Order be effective immediately upon entry.

### Notice of Sale and the Cure Amounts

D.      Actual written notice of the Motion, the assumption and assignment of the Assigned Contracts, the Auction, the Sale Hearing, the Sale of the Purchased Assets, and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, has been afforded to all known interested Persons,[3]

---

[3]   "**Person**" means an individual, a person, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a proprietorship, a firm, a labor union, estate, or a Governmental Authority or other entity, party or group.

4

including, but not limited to the following parties: (i) the Office of the United States Bankruptcy Administrator for the Eastern District of North Carolina, (ii) counsel to the Buyer, (iii) all Contract Counterparties (as defined below) and any other non-debtor parties to relevant contracts or leases (executory or otherwise), (iv) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Purchased Assets, (vi) the Internal Revenue Service, (vii) all applicable state and local taxing authorities, (viii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (ix) all parties set forth on the Creditors' Mailing Matrix maintained in this bankruptcy proceeding (collectively, the "**Notice Parties**").

E.      In accordance with the provisions of the Bidding Procedures Order, the Trustee has served notice upon the counterparties to the Assigned Contracts ("**Contract Counterparty**" or "**Contract Counterparties**"): (i) that the Trustee seeks to assume and assign to the Buyer the Assigned Contracts upon the Closing (as defined in the Purchase Agreement) of the Sale; and (ii) of the relevant Cure Amounts (as defined below). The service of such notice was good, proper, timely, adequate, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Assigned Contracts. Each of the Contract Counterparties has had an opportunity to object to the Cure Amounts set forth in the notice and to the assumption and assignment to the Buyer of the applicable Assigned Contract.

F.     As evidenced by the certificates of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, due, good, proper, timely, adequate, sufficient, and appropriate notice of the Motion, the Sale, the Auction, the Sale Hearing, and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assigned Contracts to the Buyer, was provided in accordance with the orders previously entered by the Court, sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.  The notices described herein were good, proper, timely, adequate, sufficient, and appropriate under the circumstances, and reasonably calculated to provide the Notice Parties and all other interested parties with timely and proper notice under the circumstances and no other or further notice of the Motion, the Sale, the Auction, the Sale Hearing, the Closing, the assumption and assignment of the Assigned Contracts to the Buyer or with respect to the matters described herein is, or shall be, required.  A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to the assumption and assignment of the Assigned Contracts and the Cure Amounts, has been afforded to all interested parties, including the Notice Parties.

G.     The disclosures made by the Trustee and the Buyer concerning the Sale, the Auction, the Purchase Agreement, the Motion, the Sale Hearing, and the assumption and assignment of the Assigned Contracts to the Buyer were good, proper, timely, adequate, sufficient, and appropriate.

6

H.      A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to the assumption and assignment of the Assigned Contracts and the Cure Amounts, has been afforded to all interested parties, including the Notice Parties.

### Good Faith of the Buyer

I.      The Trustee and Buyer have proffered or otherwise adduced evidence that (i) they proposed, negotiated, and entered into the Purchase Agreement without collusion, in good faith, and from arm's length bargaining positions immediately prior to the Closing, (ii) immediately prior to the Closing, neither the Buyer nor any of the Buyer Parties (as defined below) was an "insider" or "affiliate" of the Debtor (each as defined under sections 101(31) and 101(2) of the Bankruptcy Code), (iii) the Buyer and the Buyer Parties proceeded in good faith in connection with all aspects of the Sale, including, but not limited to: (a) recognizing that the Trustee was free to deal with any other party interested in acquiring the Purchased Assets pursuant to and in accordance with the Bidding Procedures Order; (b) neither inducing nor causing the filing of the bankruptcy case; (c) disclosing all payments to be made, and all other material agreements or arrangements entered into, by the Buyer in connection with the Sale; and (d) having no common identity of directors or controlling stockholders between the Buyer, on the one hand, and the Trustee or the Debtor, on the other hand, and (iv) no admissible evidence having been proffered or adduced that contradicts clauses (i) through (iii) of this paragraph.  The Buyer is therefore purchasing the Purchased Assets in good faith and is a good faith Buyer within the

meaning of section 363(m) of the Bankruptcy Code.  As such, the Buyer is entitled to all of the rights, benefits, privileges and protections afforded under section 363(m) of the Bankruptcy Code, and under any other applicable or similar bankruptcy and nonbankruptcy law.

J.  Further, neither the Trustee nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtor nor the Buyer has violated section 363(n) of the Bankruptcy by any action or inaction.  Specifically, the Buyer has not acted in a collusive manner with any Person and the Purchase Price paid by the Buyer for the Purchased Assets was not controlled by any agreement among the bidders, all of whom acted in good-faith, at arm's length, and in a noncollusive manner.  The transactions under the Purchase Agreement may not be avoided, and no damages may be assessed against the Buyer or any Buyer Party (defined below) under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

**Highest and Best Offer**

K.  The Bidding Procedures are reasonable and appropriate and represent the best available method for conducting the Sale process in a manner that maximizes value for the benefit of the Debtor's estate.  The Trustee conducted a marketing and sale process with respect to the Purchased Assets in accordance with, and has otherwise complied in all respects with, the Bidding Procedures and the Bidding

8

Procedures Order.   The marketing and Sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Purchased Assets. The Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Purchased Assets.

L.      The Purchase Agreement constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative in this bankruptcy case.  The Trustee's determination that the Purchase Agreement maximizes value for the benefit of the Debtor's estate and constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment and is in accordance and compliance with the Bidding Procedures and the Bidding Procedures Order.

M.      The Purchase Agreement represents fair and reasonable terms for the purchase of the Purchased Assets.  No other Person or group of Persons has offered to purchase the Purchased Assets for greater overall value to the Debtor's estate than the Buyer.

N.      Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby will maximize the value of the Debtor's estate, are in the best interests of the Debtor's estate, the Debtor's creditors, and other parties-in-interest.

9

**No Merger; The Buyer Not an Insider; No Successor Liability**

O.      Neither the Buyer nor any of the Buyer Parties is a successor to or a mere continuation or substantial continuation of the Debtor or the Debtor's estate, and there is no continuity of enterprise or common identity between the Buyer (or any of the Buyer Parties) and the Debtor.  None of the Buyer or the Buyer Parties is holding itself out to the public as a successor to or a continuation of the Debtor or the Debtor's estate.  Each of the Buyer and Buyer Parties is not, and shall not be, considered a successor in interest to the Debtor or the Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, mere continuation of, combination of, merger, or *de facto* merger of the Buyer and the Debtor.

P.      As set forth above, immediately prior to the Closing, neither the Buyer nor any of the Buyer Parties was an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of the Debtor, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtor on the one hand and the Buyer or the Buyer Parties on the other hand.  The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities, except as otherwise explicitly set forth in the Purchase Agreement, does not, and will not, subject the Buyer or the Buyer Parties to any liability whatsoever, with respect to the Debtor or the operation of the Debtor's businesses prior to the Closing (as modified by the Purchase Agreement) or by reason of such transfer, including under the laws of any foreign, federal, state, or local revenue, pension, tax, antitrust, environmental,

labor or employment or benefits law, including without limitation, any WARN Act, the Consolidated Omnibus Budget Reconciliation Act (COBRA), or Employee Retirement Income Security Act (ERISA), under the basis of *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtor, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtor or its affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Closing (Paragraphs O and P collectively, the "**Successor or Other Liabilities**"). Pursuant to the Purchase Agreement, the Buyer is not purchasing all of the Debtor's assets in that the Buyer is only purchasing the Purchased Assets identified in the Purchase

11

Agreement, is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities and shall have no liability for the Excluded Liabilities.

### **Validity of Transfer**

Q.    The transfer of the Purchased Assets to the Buyer will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and will vest the Buyer with all legal, equitable, and beneficial right, title, and interest of the Debtor's estate to the Purchased Assets free and clear of all Claims and Interests (as defined below) (other than Assumed Liabilities) of any kind or nature whatsoever, including without limitation, rights or claims that are Successor or Other Liabilities, or that are based on any Successor or Other Liabilities.

R.    The Purchase Agreement is a valid and binding contract between the Trustee and the Buyer and shall be enforceable pursuant to its terms.  The Purchase Agreement, the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Trustee and shall not be subject to rejection or avoidance by the Trustee or any other Person.  The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction.  The consideration provided by the Buyer for the Purchased Assets pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other available alternative, and (iv) constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). Neither the Trustee nor the Buyer is entering into the transactions contemplated by the Purchase Agreement fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

S.      The Trustee has, to the extent necessary and applicable, (i) full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iii) taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Trustee to consummate the Sale, execute the Purchase Agreement, or consummate the transactions contemplated thereby.

### Free and Clear of All Claims and Interests

T.      To the Trustee's actual knowledge, the Trustee is the sole and lawful owner of the Purchased Assets, and no other Person has any ownership right, title, or interests therein. To the Trustee's actual knowledge, the Purchased Assets constitute property of the Debtor's estate and good title thereto is vested in the

Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. To the Trustee's actual knowledge, the Trustee has (except to the extent otherwise provided in the Purchase Agreement) all right, title, and interest in the Purchased Assets. The transfer of the Purchased Assets to the Buyer will be, as of the Closing, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Trustee and the Debtor's estate to the Purchased Assets free and clear of any and all (i) liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising any time prior to the Closing (collectively, the "**Liens**"), and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, imperfections or restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, defenses, credits, allowances, options, limitations, action, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any

14

shareholder or similar agreement or encumbrance, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the bankruptcy proceeding, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right or option to effect a setoff against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, any of the Trustee's, the Bankruptcy Estate's, or the Buyer's interests in the Purchased Assets, or any similar rights, if any, or (y) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (the items in this clause (ii), collectively, the "**Claims**", and together with the Liens and other interests of any kind or nature whatsoever, the "**Claims and Interests**"), relating to, accruing, or arising any time prior to entry of this Order), with the exception of any such Claims and Interests that are expressly assumed by the Buyer as Assumed Liabilities solely to the extent set forth in the Purchase Agreement, including, for the avoidance of any doubt, Cure Amounts or any other obligations arising under the Assigned Contracts solely to the extent identified and/or set forth in the Purchase Agreement. For the avoidance of doubt, the Buyer shall obtain the Purchased Assets free and clear of any pre-petition

15

or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever, unless such Claim is expressly assumed by the Buyer as Assumed Liabilities, or Cure Amounts arising under the Assigned Contracts.

U. The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

### Section 363(f) Is Satisfied

V. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the Purchased Assets free and clear of any Claims and Interests in the Purchased Assets (other than the Assumed Liabilities).

W. The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Purchased Assets to the Buyer, and the assumption and assignment of the Assigned Contracts to the Buyer, were not free and clear of all Claims and Interests of any kind or nature whatsoever (except the Assumed Liabilities), or if the Buyer would, or in the future could, be liable for any of such Claims and Interests (except the Assumed Liabilities), including, without limitation any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever arising under contracts that are not Assigned Contracts. The Buyer will not consummate the transactions contemplated by the Purchase Agreement unless the Court expressly orders that none of the Buyer, its affiliates, its past, present and future members,

16

shareholders, subsidiaries, parents, divisions, agents, representatives, insurers, attorneys, successors and assigns, or any of its or their respective directors, managers, officers, employees, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (each a "**Buyer Party**", and collectively, the "**Buyer Parties**"), or the Purchased Assets, will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Claims and Interests (other than Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities. The total consideration to be provided under the Purchase Agreement reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever (including, without limitation, free and clear of any potential Successor or Other Liabilities of any kind whatsoever including potential Successor or Other Liabilities in connection with any pre-petition or post-petition Claim for royalties or any other payments or obligations arising under contracts that are not Assigned Contracts).

X.     Not transferring the Purchased Assets free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities and/or applicable state, federal, or foreign law or otherwise, would adversely impact the

17

Trustee's efforts to maximize the value of the Debtor's estate, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever (including any potential Successor or Other Liabilities) would be of substantially less benefit to the Debtor's estate.

Y. The Trustee may sell the Purchased Assets free and clear of all Claims and Interests against the Debtor, its estate, or any of the Purchased Assets (except the Assumed Liabilities) because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Interests against the Debtor, its estate, or any of the Purchased Assets, who did not timely object, or who withdrew their objections to, the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Claims and Interests (except to the extent that such Claims and Interests are Assumed Liabilities) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. All holders of Claims and Interests are adequately protected by having their Claims and Interests, if any, in each instance against the Debtor, its estate, or any of the Purchased Assets attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such holder alleges a Claim and Interest, in the same order of priority, with the same validity, force, and effect that such Claim and Interest had prior to the Sale, subject to any claims and defenses the Trustee, the Debtor, and the Debtor's estate may possess thereto.

### Assumption and Assignment of the Assigned Contracts

Z.      The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order, the Bidding Procedures Order, and the Purchase Agreement, is integral to the Purchase Agreement and is in the best interests of the Debtor, its estate, its creditors, and all other parties-in-interest, and represents the Trustee's reasonable exercise of sound and prudent business judgment.  The assumption and assignment of the Assigned Contracts (i) is necessary to sell the Purchased Assets to the Buyer, (ii) allows the Trustee to maximize the value of the Purchased Assets, including the Assigned Contracts, (iii) limits the losses suffered by counterparties to the Assigned Contracts, and (iv) maximizes the recoveries to other creditors of the Debtor by limiting the amount of claims against the Debtor's estate by avoiding the rejection of the Assigned Contracts.  For these reasons, the Trustee has exercised sound business judgment in assuming and assigning the Assigned Contracts and such assumption and assignment is in the best interests of the Debtor's estate.

AA.     Pursuant to section 365(f) of the Bankruptcy Code, each of the Assigned Contracts required to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in such contract or other restrictions prohibiting its assignment or transfer.  No party in interest with standing to object to the assumption and assignment of any Assumed Contract has objected to the assignment and transfer of the Assumed Contracts to the Buyer.  No section of any of the Assigned Contracts that would prohibit, restrict, or condition, whether directly

or indirectly, the use, assumption, or assignment of any of the Assigned Contracts in connection with the Sale shall have any force or effect.

BB.   Except as expressly assumed by the Buyer under the Purchase Agreement, the transfer of the Purchased Assets to the Buyer and the assignment to the Buyer of the Assigned Contracts will not subject the Buyer or any Buyer Party to any liability whatsoever which may become due or owing under the Assigned Contracts prior to the Closing (other than Cure Amounts with respect to the Buyer), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities.

CC.   The respective amounts set forth on **Exhibit B** annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all pecuniary losses under the Assigned Contracts, subject in all respects to the terms and conditions of the Purchase Agreement including Section 2.4  therein (the "**Cure Amounts**").

DD.   The Buyer has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to the respective Assigned Contracts.

### Compelling Circumstances for an Immediate Sale

20

EE.    The Trustee demonstrated through the testimony and/or other evidence proffered or adduced in connection with the Motion, at the hearing to consider approval of the Bidding Procedures Order (and the Bidding Procedures) and at the Sale Hearing, and the arguments, statements and representations of counsel made on the record of the Sale Hearing good and sufficient reasons for approval of the Purchase Agreement, the Sale and the transactions contemplated thereby.  The relief requested in the Motion is in the best interests of the Debtor, the Debtor's estate, its creditors, and all other parties-in-interest.  The Trustee has demonstrated (i) good, sufficient, and sound business purposes and justifications for approving the Purchase Agreement and (ii) compelling circumstances for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement for the Sale, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtor's estate, and the Sale will provide the means for the Trustee to maximize distributions to creditors. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this Order.

FF.    To maximize the value of the Purchased Assets and preserve the viability of the businesses to which they relate, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement.  Time is of the essence in consummating the Sale.

GG.    Given all of the circumstances of the bankruptcy case and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed

Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

HH.    The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

### General Provisions

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this bankruptcy proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

2.    The Motion and the relief requested in the Motion is granted and approved, and the Sale and the transactions contemplated in the Motion and by the Purchase Agreement are approved.

3.    The Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order remain in full force and effect.

4. All objections to, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the Purchase Agreement, the Sale, the entry of this Order, or the relief granted herein, including, without limitation, any objections to Cure Amounts or relating to the cure of any defaults under any of the Assigned Contracts or to the assumption and assignment of any such Assigned Contracts to the Buyer by the Trustee, that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court or otherwise been resolved pursuant to the terms thereof, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice. Those parties who did not object or withdrew their objections to the Motion or the entry of this Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) and section 365(c)(1)(B) of the Bankruptcy Code.

**Approval of the Purchase Agreement**

5. The Trustee is authorized to enter into the Purchase Agreement. Pursuant to sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (ii) close the Sale as contemplated in the Purchase Agreement and this Order, and (iii) execute and deliver, perform under,

consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the Purchase Agreement, without further notice to or order from the Court, including the assumption and assignment of the Assigned Contracts to the Buyer and execution of a general release of claims as set forth at section 8.10 of the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale.

6.      This Order shall be binding in all respects upon (a) the Trustee, (b) the Debtor and the Debtor's estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) all holders of Liens, encumbrances, or other Claims and Interests (whether known or unknown) in, against, or on all or any portion of the Purchased Assets, (e) all the Contract Counterparties, (f) the Buyer and all successors and assigns of the Buyer, (g) the Purchased Assets, and (h) all successors and assigns of each of the foregoing.  This Order shall inure to the benefit of the Trustee, the Debtor, the Debtor's estate and its creditors, the Buyer, the Buyer Parties, and the respective successors and assigns of each of the foregoing, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtor's estate.

### Transfer of the Purchased Assets

7.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets, including the Assigned Contracts, to the Buyer on the Closing in accordance with the

terms of the Purchase Agreement, and such transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Purchased Assets, (b) vest the Buyer with title to and possession of the Purchased Assets, and (c) upon the Trustee's receipt of the Purchase Price, be free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever, including, without limitation, any potential Successor or Other Liabilities, with such Claims and Interests to attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such Claim and Interest is alleged in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets (subject to any rights, claims and defenses the Debtor or the estate may possess with respect thereto).  Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities.

8.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale and transfer of the Debtor's right, title and interest in the Purchased Assets to the Buyer pursuant to the Purchase Agreement is a legal, valid and effective disposition of the Purchased Assets, and vests the Buyer with all right, title and interest of the Debtor to and in the Purchased Assets free and clear of all Claims and Interests.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full and the Debtor's sale of the Purchased Assets shall be free and clear of any Claims and Interests in the Purchased Assets (other than the Assumed Liabilities), including, without limitation, any pre-petition or post-petition Claim for royalties or any other

payments or obligations of any kind whatsoever arising under contracts that are not Assigned Contracts.

9.     To the extent provided for in the Purchase Agreement, any and all of the Debtor's security deposits, or other security held by landlords, lessors and other counterparties to the contracts, leases, and licenses that are to be assumed and assigned under the Purchase Agreement are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing (as modified by the Purchase Agreement), which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Order or the Purchase Agreement.

10.     The Trustee is hereby authorized to take any and all actions necessary to consummate the transactions contemplated by the Purchase Agreement, including any actions that otherwise would require further approval by shareholders, partners, members, or their respective boards of directors or boards of managers, as the case may be, without the need of obtaining such approvals.

11.     Each and every federal, state, local, and other governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

12.     The transactions authorized herein shall be of full force and effect, regardless of the Debtor's  lack of good standing in any jurisdiction in which they are

formed or authorized to transact business.  Upon Closing of the transactions set forth in the Purchase Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Claims and Interests, with respect to the Purchased Assets, that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

13.     Subject to the terms, conditions, and provisions of this Order, all Persons are hereby forever prohibited and barred from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Order.

14.     The Buyer may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which the Debtor is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder.

15.     The provisions of this Order authorizing the Sale of the Purchased Assets free and clear of all Claims and Interests, other than Assumed Liabilities, shall be self-executing, and neither the Trustee nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.  If any Person which has filed a financing statement, mortgage, mechanic's

lien, *lis pendens*, or other statement, document, or agreement evidencing any Claims and Interests on, or in, all or any portion of the Purchased Assets (other than statements or documents with respect to Assumed Liabilities) shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or any other documents necessary for the purpose of documenting the termination of all Claims and Interests which the Person has or may assert with respect to all or any portion of the Purchased Assets, then (i) the Trustee is hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Purchased Assets, (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the termination of all Claims and Interests of any kind or nature against or in the Purchased Assets, and (iii) the Buyer is authorized to seek in the Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Claims and Interests that such Person has against or in the Purchased Assets.

16.     On the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Trustee's and the Debtor's estate's interests in the Purchased Assets. And with respect to the Purchased Assets, this Order is and shall be effective as a

28

determination that, on the Closing, all Claims and Interests and any other interest of any kind or nature whatsoever including, without limitation, any Successor or Other Liabilities existing as to such Purchased Assets prior to the Closing, other than the Assumed Liabilities, shall have been terminated, and that the conveyances described herein have been effected; provided, however, that such Claims and Interests shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets.

17. To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Purchased Assets and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing.

18. To the extent section 525 of the Bankruptcy Code is applicable, no governmental unit may deny, revoke or suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of this bankruptcy proceeding or the consummation of the transactions contemplated by the Purchase Agreement, including the Sale and the assumption and assignment of the Assigned Contracts.

**No Successor Liability**

19.   Neither the Buyer nor any of the Buyer Parties is a "successor" to, continuation of, or alter ego of, of the Debtor or the Debtor's estate by reason of any theory of law or equity.  Except for the Assumed Liabilities, the Buyer and the Buyer Parties shall not have assumed, or be deemed to have assumed, or in any way be responsible for, any liability or obligation of the Debtor, or the Debtor's estate, or any of the Debtor's predecessors or affiliates with respect to the Purchased Assets or otherwise.  Neither the purchase of the Purchased Assets by the Buyer nor the fact that the Buyer is using any of the Purchased Assets previously used or operated by the Debtor will cause the Buyer or any of the Buyer Parties to be deemed a successor to, combination of, or alter ego of, in any respect, of the Debtor or the Debtor's businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether

arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtor, and the Debtor's business and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtor or its respective affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.

**Claims and Interests; Prohibition of Actions Against the Buyer**

20.    Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Purchase Agreement, neither the Buyer nor any of the Buyer Parties shall have any liability, responsibility or obligation for any Claims and Interests of the Debtor or the Debtor's estate, including any claims, liabilities, or other obligations arising under or related to any of the Purchased Assets which may become due or owing (a) prior to the Closing or (b) from and after the Closing but which arise out of or relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing.

21.    Except with respect to Assumed Liabilities, or as otherwise permitted by the Purchase Agreement or this Order, all Persons, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, Contract Counterparties, customers, landlords, licensors, employees, and other creditors and holders of Claims and Interests of any kind or nature whatsoever against or in the Debtor or any portion

31

of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing, or the transfer of the Purchased Assets to the Buyer (including without limitation any Successor or Other Liabilities or rights or claims based thereon or based in any manner upon any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever arising under contracts that are not Assigned Contracts) shall be, and hereby are forever barred and estopped from asserting against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets, the Claims and Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtor, the Debtor's estate, officers, directors, shareholders, or the Purchased Assets, such Persons' Claims and Interests or any other interests in and to the Purchased Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any

judgment, award, decree, or order against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (c) creating, perfecting, or enforcing any Claims and Interests against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (d) asserting any setoff, or right of subrogation of any kind against any obligation due to the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply with or is inconsistent with the provisions of this Order, other orders of the Court, the Purchase Agreement or any other agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets in connection with the Sale.

22.     On the Closing, or as soon as possible thereafter, each creditor shall, and the Buyer is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release any Claims and Interests and other interests in or on the Purchased Assets (except Assumed Liabilities), if any, as provided for herein, as such Claims and Interests may have been recorded or may otherwise exist.

23.     All Persons are hereby barred and forever prohibited from taking any action that would adversely affect or interfere with the ability of the Debtor to sell

and transfer the Purchased Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Order.

24.     The consideration provided by the Buyer for the Purchased Assets under the Purchase Agreement is fair and reasonable, and accordingly, the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

25.     Following the Closing, no holder of a Claim or an Interest in the Debtor shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets and the Assigned Contracts based on or related to such Claim or Interest.

### Assumption and Assignment of Contracts

26.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code and the Bidding Procedures Order, and subject to and conditioned upon the terms of the Purchase Agreement (including, without limitation, Sections 2.4 and 9.2 of the Purchase Agreement), the Closing, and payment of the applicable Cure Amounts by the Buyer (pursuant to the terms of the Purchase Agreement, including Section 2.4(h) thereof), the Trustee's assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Purchase Agreement, of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the Closing and payment of the applicable Cure Amounts by the Buyer pursuant to the terms of the Purchase Agreement (including Section 2.4(h)  thereto) and in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Trustee and the Debtor in

34

and under the Assigned Contracts free and clear of any Claims or Interests, and each such Assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited by this Order.  To the extent provided in the Purchase Agreement, the Trustee shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

27.    With respect to the assumption and assignment of the Assigned Contracts to Buyer as provided in Paragraph 26 of this Order:  (a) any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, shall be deemed satisfied or shall constitute unenforceable anti-assignment provisions which are void and of no force and effect; (b) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Buyer of each Assigned Contract have been satisfied; and (c) effective upon the Closing, the Assigned Contracts shall be transferred and assigned to, and from and following the Closing (as modified by the Purchase Agreement) shall remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any Assigned Contract (including those of the type described in sections 365(b)(2) and (c) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and pursuant to section 365(k) of the Bankruptcy Code, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contract and the

35

Trustee shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer, except as otherwise provided in the Purchase Agreement.  Further, to the extent any provision in any of the Assigned Contracts assumed and assigned pursuant to Paragraph 26 of this Order (i) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment (including, without limitation, any "change of control" provision), or (ii) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (A) the commencement of this bankruptcy proceeding, (B) the insolvency or financial condition of the Debtor at any time before the closing of this bankruptcy proceeding, (C) the Debtor's or the Trustee's assumption and assignment of such Assigned Contract, (D) a change of control or similar occurrence, or (E) the consummation of the Sale, then such provision shall be deemed modified in connection with the Sale so as not to entitle the Contract Counterparty thereto to prohibit, restrict, or condition such assumption and assignment, to modify, terminate, or declare a breach or default under such Assigned Contract, or to exercise any other default-related rights or remedies with respect thereto, including without limitation, any such provision that purports to allow the Contract Counterparty thereto to terminate or recapture such Assigned Contract, impose any penalty, additional payments, damages, or other financial accommodations in favor of the Contract Counterparty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.

All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect in connection with the Sale pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

28. All defaults or other obligations of the Debtor or the Trustee under the Assigned Contracts arising or accruing prior to the Closing or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (in each case, without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be cured solely to the extent set forth in the Purchase Agreement (including Section 2.4 thereto) and this Order on the Closing or as soon thereafter as reasonably practicable.

29. All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Buyer of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtor in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited by this Order. To the extent provided in the Purchase Agreement, the Trustee shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

30. Upon the Trustee's assignment of the Assigned Contracts to the Buyer under the provisions of this Order and the Buyer's payment of the Cure Amounts

pursuant to the terms of the Purchase Agreement (including Section 2.4 thereto) no default or other obligations arising prior to the Closing shall exist under any Assigned Contract, and each Contract Counterparty to an Assigned Contract is forever barred and estopped from (a) declaring a default by the Debtor or the Buyer under such Assigned Contract, (b) raising or asserting against the Debtor or the Buyer (or any Buyer Party), or the property of either of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, or (c) taking any other action against the Buyer or any Buyer Party as a result of the Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract, in each case in connection with the Sale.  Each Contract Counterparty is also forever barred and estopped from raising or asserting against the Buyer or any Buyer Party any assignment fee, default, breach, Claim, pecuniary loss, or condition to assignment arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the closing of the Sale, except for any amounts that are Assumed Liabilities.

31.     Any party that may have had the right to consent to the assumption or assignment of an Assigned Contract, including (if applicable) the Contract Counterparty to each Assigned Contract, is deemed to have consented to such assumption and assignment for purposes of sections 365(c)(1)(B) and 365(e)(2)(A)(ii) of the Bankruptcy Code and any other applicable law if such party failed to object timely to the assumption or assignment of such Assigned Contract (in accordance with, among other things, the Bidding Procedures Order (if any)), and the Buyer shall

enjoy all of the Debtor's rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such Contract Counterparty's written consent to the assumption or assignment thereof.  The Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to each such Assigned Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

32.     To the extent a Contract Counterparty to an Assigned Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such Contract Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall be deemed to resolve any defaults or other breaches with respect to any Assigned Contract to which it relates.

33.     Reference is made to that certain Asset Purchase Agreement, dated as of July 19, 2021 (as amended, supplemented, restated or modified, the "**Lobesity APA**"), by and between the Debtor and Lobesity LLC ("**Lobesity**").  Among other things, pursuant to the Lobesity APA, Lobesity sold, conveyed, transferred and assigned to the Debtor, and the Debtor purchased and acquired from Lobesity, all of Lobesity's right, title and interest in, among other things, certain owned and licensed intellectual property, including intellectual property licensed from MHS Care-Innovation LLC ("**Licensor**"), and certain contracts, including that certain Amended and Restated Technology License Agreement, dated as of July 14, 2021, by and between Lobesity and Licensor (as amended, supplemented, restated or modified, the

39

"**License Agreement**").  For the avoidance of doubt, the Trustee is not assuming and assigning the Lobesity APA to Buyer, the Lobesity APA is an Excluded Liability, and unless the Licensor, the Trustee and the Buyer agree otherwise in writing, at the Closing, (a) the Trustee will assign and convey to Buyer all of the Debtor's rights in and to the License Agreement, which License Agreement constitutes an Assigned Contract; (b) the Trustee shall assign and convey to Buyer all of the Debtor's right, title and interest in and to the patents, patent rights and other intellectual property which were purchased by the Debtor under the Lobesity APA or otherwise subject to the License Agreement and which constitute Purchased Assets; and (c) the Buyer shall cure all defaults and pay all amounts owing under the License Agreement, which are in the amount of $0 (zero dollars) pursuant to the Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases filed with the Court by the Trustee on December 5, 2023 [D.E. #123].

34.    With respect to objections to any Cure Amounts that remain unresolved as of the Sale Hearing, such objections shall be resolved in accordance with the procedures to be developed among the applicable Contract Counterparty, the Trustee, and the Buyer.

35.    For the avoidance of doubt, a Contract shall not be an Assigned Contract pursuant to the Purchase Agreement and shall not be assigned to, or assumed by Buyer to the extent that such Contract was not listed on the Assigned Contract List.

36.    Nothing in this Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Trustee or Debtor that any

40

contract or Assigned Contract is an executory contract or unexpired lease or must be assumed and assigned pursuant to the Purchase Agreement or in order to consummate the Sale.

## Buyer Standing and Assumed Liabilities

37.     The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Debtor or its estate including, without limitation, any unresolved or disputed Assumed Liabilities, Cure Amounts or otherwise, that constitute obligations assumed by the Buyer pursuant to the terms of the Purchase Agreement.  Nothing in this Order shall divest the Trustee of his standing or duty under the Bankruptcy Code from reconciling claims asserted against the Debtor or the Debtor's bankruptcy estate and objecting to any such claims that should be reduced, reclassified or otherwise disallowed.

## Other Provisions

38.     This Order shall be binding in all respects upon the Trustee, all of the Debtor's creditors and equity-holders, all Contract Counterparties, all successors and assigns of the Debtor, and any of their respective affiliates and subsidiaries, any trustees, examiners, "responsible persons," or other fiduciaries appointed in this bankruptcy proceeding.  The Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

39.     The Purchase Agreement and any other documents ancillary thereto may be modified, amended, or supplemented by the parties thereto in a writing signed

41

by the parties, in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

40.    The transactions contemplated by the Purchase Agreement and this Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or otherwise impair the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code.  As a good faith buyer of the Purchased Assets, the Buyer has not entered into an agreement with any other potential bidders and has not colluded with any potential or actual bidders, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

41.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

42.    The failure to specifically include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized in its entirety.  All of the provisions of this Order are non-severable and mutually dependent.

42

43.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Order and the Purchase Agreement, including but not limited to the injunctions and limitations of liability set forth in this Order, (c) protect the Buyer against any Claims and Interests in or against the Debtor or the Purchased Assets of any kind or nature whatsoever attaching to the net cash proceeds of the Sale as provided herein including, without limitation, to enjoin the commencement or continuation of any action seeking to impose successor liability or bulk sale liability; (d) enter any orders under sections 105, 363 and 365 of the Bankruptcy Code with respect to the Purchased Assets and the Assigned Contracts; (e) decide any disputes concerning this Order, the Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Claims and Interests; (f) adjudicate any and all remaining issues concerning the Trustee's right and authority to assume and assign the Assigned Contracts and the rights and

obligations of the Trustee and the Buyer with respect to such assignment and the existence of any default under any such Assigned Contract; (g) adjudicate any and all disputes concerning alleged pre-closing Claims and Interests in and to the Purchased Assets including without limitation the extent, validity, enforceability, priority, and nature of any and all such alleged Claims and Interests; (h) adjudicate any and all disputes relating to the Debtor's right, title, or interest in the Purchased Assets and the proceeds thereof; and (i) re-open the bankruptcy proceeding to determine any of the foregoing.

44.     Notwithstanding any provision in the Motion, the Purchase Agreement, this Order, and any implementing sale documents (collectively, "**Sale Documents**"), nothing shall: (1) authorize the  assumption, sale, assignment or other transfer to the Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, including but not limited to, any Medicare Coverage Gap Discount Program Agreement, (vii) certifications, (viii) applications or other interests of the federal government (collectively, "**Federal Interests**") without compliance by the Trustee and the Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights or

defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws; (6) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property; (7) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (8) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order; or (9) expand the scope of 11 U.S.C.§ 525.  For the avoidance of doubt and without limiting the foregoing, notwithstanding any provision in the Sale Documents, nothing shall impair, affect, alter or modify any statutes (including but not limited to the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act), regulations, rules, guidelines, standards, policies and procedures of the Department of Health and Human Services, including but not limited to, the Food and Drug Administration.

45. For cause shown, this Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6004(d) are hereby expressly waived and shall not

apply.  Accordingly, the Trustee and the Buyer are authorized and empowered to close the Sale immediately upon entry of this Order subject to the terms of the Purchase Agreement.

46.    To the extent that this Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Motion in this bankruptcy proceeding, the terms of this Order shall govern.

**END OF DOCUMENT**

**ASSET PURCHASE AGREEMENT**

**by and between**

**HELICORE BIOVENTURES I, INC.,**

**as Purchaser**

**and**

**GEORGE F. SANDERSON,**

**as the Chapter 7 Trustee of the Bankruptcy Estate of 9 Meters Biopharma, Inc.**

**January 5, 2024**

317149351.7

## TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ............................................................................... 1

**ARTICLE II PURCHASE AND SALE OF ASSETS** ........................................ 7

Section 2.1   Sale and Transfer of Purchased Assets; Excluded Assets ................................ 7
Section 2.2   Assumed Liabilities ............................................................... 7
Section 2.3   Excluded Liabilities ............................................................. 8
Section 2.4   Assignment of Assigned Contracts. ........................................... 8

**ARTICLE III** ......................................................................................... 11

**CONSIDERATION** ................................................................................. 11
Section 3.1   Purchase Price .................................................................... 11
Section 3.2   Required Deposit; Payment of the Consideration .......................... 11
Section 3.3   Post-Closing Allocation of Purchase Price ................................. 11
Section 3.4   Withholding ........................................................................ 12

**ARTICLE IV CLOSING** ......................................................................... 12

Section 4.1   Closing ............................................................................. 12
Section 4.2   Deliveries by Seller .............................................................. 12
Section 4.3   Deliveries by Purchaser ......................................................... 13

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ......................... 13

Section 5.1   Authorization; Enforceability ................................................. 13
Section 5.2   Title to Purchased Assets ....................................................... 13
Section 5.3   Contracts .......................................................................... 14
Section 5.4   Broker's, Finder's or Similar Fees ........................................... 14
Section 5.5   No Other Representations or Warranties ...................................... 14

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............... 14

Section 6.1   Organization ...................................................................... 15
Section 6.2   Authorization; Enforceability ................................................. 15
Section 6.3   No Conflicts ...................................................................... 15
Section 6.4   Consents and Approvals ........................................................ 15
Section 6.5   Broker's, Finder's or Similar Fees ........................................... 15
Section 6.6   No Other Representations or Warranties ...................................... 15

**ARTICLE VII [RESERVED]** ................................................................... 16

Section 7.1   [Reserved] ......................................................................... 16

i

**ARTICLE VIII COVENANTS** ................................................................................. 16

Section 8.1 Tax Matters. ............................................................................ 16
Section 8.2 Maintenance of Assets. ........................................................... 16
Section 8.3 Access to Information. ............................................................. 17
Section 8.4 [Reserved] ............................................................................... 18
Section 8.5 Reasonable Efforts; Cooperation. .......................................... 18
Section 8.6 Notification of Certain Matters. ............................................. 19
Section 8.7 Misdirected Assets .................................................................. 19
Section 8.8 Further Assurances .................................................................. 19
Section 8.9 Communications with Customers and Suppliers ..................... 19
Section 8.10 Release of Claims ................................................................... 19
Section 8.11 Bankruptcy Court Matters ...................................................... 20

**ARTICLE IX CONDITIONS** ................................................................................. 21

Section 9.1 Conditions Precedent to Performance .................................... 21
Section 9.2 Conditions to Obligations of Purchaser .................................. 21
Section 9.3 Conditions to Obligations of Seller ........................................ 22

**ARTICLE X TERMINATION** ................................................................................ 22

Section 10.1 Termination .............................................................................. 22
Section 10.2 Effect of Termination; Required Deposit ............................... 23
Section 10.3 [Reserved] ............................................................................... 23

**ARTICLE XI MISCELLANEOUS** ......................................................................... 23

Section 11.1 Survival of Covenants, Representations and Warranties ......... 23
Section 11.2 Fees and Expenses .................................................................. 24
Section 11.3 Amendment and Modification ................................................ 24
Section 11.4 Notices .................................................................................... 24
Section 11.5 Counterparts ............................................................................ 25
Section 11.6 Mutual Drafting ...................................................................... 25
Section 11.7 Entire Agreement; No Third Party Beneficiaries .................... 25
Section 11.8 Severability ............................................................................. 25
Section 11.9 Governing Law ........................................................................ 25
Section 11.10 Exclusive Jurisdiction ............................................................. 25
Section 11.11 Remedies ................................................................................. 26
Section 11.12 Specific Performance. ............................................................. 26
Section 11.13 Assignment ............................................................................. 26
Section 11.14 Headings ................................................................................. 27
Section 11.15 No Consequential or Punitive Damages .................................. 27
Section 11.16 Bulk Transfer Notices ............................................................. 27
Section 11.17 Interpretation. .......................................................................... 27

ii

Schedule 2.1:  Purchased Assets
Schedule 2.4(a):  Assigned Contracts

Exhibit A-1    -        Form of Assignment and Assumption Agreement
Exhibit A-2    -        Form of Bill of Sale
Exhibit B       -        Sale Order

iii

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of January 5, 2024, is made and entered into by and between Helicore Bioventures I, Inc., a Delaware corporation ("Purchaser"), and George F. Sanderson, as the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 bankruptcy estate (the "Estate") of 9 Meters Biopharma, Inc., a Delaware corporation ("Debtor").

## RECITALS

WHEREAS, on July 17, 2023 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court");

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, the Purchased Assets, all on the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the Transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, Seller has determined that it is advisable and in the Estate's best interests to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

For purposes of this Agreement, the following capitalized terms shall have the following meanings:

"Action" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity or arbitrator.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereof.

"Allocation Statement" has the meaning set forth in Section 3.3.

1

"Alternate Bid" has the meaning set forth in the Bidding Procedures.

"Alternate Bidder" has the meaning set forth in the Bidding Procedures.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Estate's assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree of any Governmental Entity to which any Purchased Asset is, or Debtor, any Subsidiaries of Debtor, or the Estate are, subject, or which otherwise apply to the Transactions or to any obligation of a party under this Agreement.

"Assigned Contracts" means the Contracts listed on Schedule 2.4(a) attached hereto, including all amendments thereto and all extension, renewal and option rights thereunder, as such list may be adjusted pursuant to Section 2.4.

"Assignment and Assumption Agreement" means the assignment and assumption agreement substantially in the form attached as **Exhibit A-1**.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" is defined in the Bidding Procedures.

"Backup Bidder" is defined in the Bidding Procedures.

"Bankruptcy Case" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" has the meaning set forth in the recitals hereof.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" means the bidding procedures in the form attached to the Bidding Procedures Order.

"Bidding Procedures Order" means that certain Order (I) (A) Approving Bidding Procedures for Sale of the Purchased Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and Designating Incregen Therapeutics LLC as a Stalking Horse Bidder, (B) Scheduling an Auction and Approving the Form and Manner of Notice thereof, (C) Approving Assumption and Assignment Procedures and (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof, and (II) Granting Related Relief [Dkt. No. 116].

"Bill of Sale" means the bill of sale substantially in the form attached as **Exhibit A-2** hereto.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

2

"Cash Purchase Price" has the meaning set forth in Section 3.1.

"Closing" means the consummation of all Transactions on the terms set forth in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1(b).

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Conveyance Documents" means (a) the Bill of Sale; (b) the Assignment and Assumption Agreement; and (c) all other documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Purchased Assets from the Estate which require execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser.

"Cure Amounts" means all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code, or as otherwise agreed to between Purchaser and the counterparties to such Assigned Contracts, in connection with the assumption by the Seller and assignment to Purchaser of the Assigned Contracts (which, for the avoidance of doubt, shall not include Contracts that are removed as Assigned Contracts prior to Closing pursuant to Section 2.4) hereunder.

"Cure Cap" means an aggregate amount equal to $6,500,000, which amount may be increased in Purchaser's sole discretion.

"Damages" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Debtor" has the meaning set forth in the preamble hereof.

"Estate" has the meaning set forth in the preamble hereof.

"Excluded Assets" has the meaning set forth in Section 2.1.

"Excluded Contract" means any Contract that is not an Assigned Contract.

"FDA" means the United States Food and Drug Administration.

"Government Approvals" means any and all consents, Permits and Orders of all Governmental Entities that are, or may become, necessary for the execution, delivery or performance by a party hereto of its obligations under this Agreement or the Conveyance Documents or otherwise for the consummation of the Transactions.

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial or territorial government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Health Care Laws" include, but are not limited to the following: the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"); the Prescription Drug Marketing Act, as amended

3

by the Drug Supply Chain Security Act; the Public Health Service Act (42 U.S.C. § 201 et seq.); the Federal Trade Commission Act (15 U.S.C. § 41 et seq.); the Controlled Substances Act (21 U.S.C. § 801 et seq.) ("CSA"); the Criminal Health Care Fraud Statute (18 U.S.C. § 1347); the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the civil monetary penalties law (42 U.S.C. § 1320a-7a); the criminal False Claims Act (18 U.S.C. § 287); the civil False Claims Act (31 U.S.C. § 3729 et seq.); the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)); any regulations promulgated pursuant to such laws; and any other state, federal or ex-U.S. laws or regulations governing the manufacturing, packaging, labeling, advertising, marketing, storage, import, export, promotion, distribution, or sale of Product, to the extent applicable to Debtor (in connection with the Purchased Assets or the Assumed Liabilities) or any Subsidiary of Debtor.

"Indebtedness" means, as to any Person, without duplication, as of the date of determination (i) all obligations of such Person for borrowed money, including accrued and unpaid interest, and any prepayment fees or penalties, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all lease obligations of such Person capitalized in the books and records of such Person, (iv) all Indebtedness of others secured by a Lien on property or assets owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (v) all letters of credit or performance bonds issued for the account of such Person, to the extent drawn upon, and (vi) all guarantees of such Person of any of the foregoing of any other Person.

"IRS" means the United States Internal Revenue Service.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"Know-How" means any and all information, know-how, trade secrets, ideas, inventions, invention disclosures, discoveries and improvements, data, files, plans, operating records, instructions, proprietary or other processes, formulas, formulation information, manufacturing or other technology, validations, package specifications, chemical specifications, chemical and finished goods analytical test or other methods, materials (biological or chemical), stability data, clinical data, nonclinical data, safety data, adverse event report data, databases, manufacturing know-how, product specifications, information with respect to expert opinions, drawings, schematics, reports and information (whether or not patented or patentable), technology and techniques.  For the avoidance of doubt, Know-How excludes Patent Rights.

"Liabilities" means all claims, demands, expenses, commitments and obligations, whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case, of or against the Debtor, the Estate or the Purchased Assets.

"Lien" or "Liens" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Marketing Authorization" means, to the extent of the Debtor's interest therein, any Investigational New Drug Application (as defined by the FDA), New Drug Application (as defined by the FDA), Abbreviated New Drug Application (as defined by the FDA) ("ANDA"), or similar regulatory application with respect to the Product, that has been submitted to or approved by the FDA (other than withdrawn submissions or approvals), each as amended, supplemented or otherwise modified.

4

"NM-136" has the meaning set forth in the definition of "Product."

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Overbid" is defined in the Bidding Procedures.

"Patent Rights" means all (a) issued patents; (b) pending patent applications and any related patent applications filed in the future claiming priority thereto, including all provisional applications, non-provisional applications, international (PCT) applications, substitutions, continuations, continuations in part, divisions, renewals, and all patents granted thereon or issuing therefrom; (c) all patents of addition, reissues, re-examinations and extensions or restorations by existing or future extension or restoration mechanisms, including supplementary protection certificates or the equivalent thereof; (d) registration patents, inventor's certificates or confirmation patents; and (e) any form of government-issued right substantially similar to any of the foregoing, in each case in any country or patent examining or granting jurisdiction.

"Petition Date" has the meaning set forth in the recitals hereof.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Product" means (a) the proprietary gastric inhibitory polypeptide (*GIP*) antibody designated as "NM-136," which is a humanized IgG1 monoclonal antibody ("NM-136"), including any such antibody in any form, formulation, or derivative thereof, including murine forms, and (b) any pharmaceutical composition or product in any form or formulation that includes, in whole or a component thereof, any such antibody described in clause (a).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" means all right, title and interest in and to all of the properties, rights interest and other tangible and intangible assets of the Seller, the Estate, Debtor or any Affiliate of Debtor to the extent solely used in, solely held for use in or solely related to the Product, which shall include the Product, Assumed Liabilities, Assigned Contracts, Marketing Authorizations and other assets set forth on Schedule 2.1.

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser Released Parties" has the meaning set forth in Section 8.10.

5

"Qualified Bid" is defined in the Bidding Procedures.

"Regulatory Documentation" means, to the extent related to the Product or its development, manufacture, or commercialization and owned by the Debtor's bankruptcy estate, (i) all regulatory applications, submissions, filings, underlying material data, datasets and supporting documents (including copies of all material correspondence with any Governmental Entity), including any Marketing Authorizations, and any pharmacovigilance data and documentation, and any cGMP-related information (including the last sequence used in an electronic common technical document (eCTD), the most recent master batch records, exhibit batch records and test methods, stability data, and information regarding material and component sources), (ii) correspondence submitted to, or received from, the FDA, (iii) records maintained under Applicable Law, including state or local product-specific applications, annual and safety reports, adverse event reports, master files, warning letters, notices of adverse finding letters, FDA establishment inspection reports, periodic safety update reports, complaint files, advertising and promotional labeling submissions, and annual product quality reviews, (iv) animal testing reports related to the Product, and (v) any other books and records.

"Release" means a written release of the Purchaser Released Parties as provided in Section 8.10, in form and substance reasonably acceptable to Purchaser.

"Representatives" means, with respect to a Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries.

"Required Deposit" has the meaning set forth in Section 3.2(a).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Transaction.

"Sale Motion" has the meaning set forth in Section 8.11.

"Sale Order" means an order of the Bankruptcy Court substantially in the form and substance of **Exhibit B**, with any changes that Purchaser may approve in advance in its sole and absolute discretion, that has not been stayed, vacated, or stayed pending appeal, authorizing and approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth herein.

"Seller" has the meaning set forth in the preamble hereof.

"Subsidiary" means, with respect to any Person, (i) any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is owned or controlled, directly or indirectly, by such Person, or (ii) any limited liability company, partnership, association or other business entity of which a majority of the equity interest is owned or controlled, directly or indirectly, by such Person.

"Tax" or "Taxes" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, escheat or unclaimed property, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

6

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

"Transactions" means the purchase and sale of the Purchased Assets by Seller to Purchaser, the delivery of the Purchase Price, the assumption of the Assumed Liabilities, and the other transactions provided for or contemplated by this Agreement and/or any other document required hereunder.

"Transfer" means sell, convey, assign, transfer, deliver or otherwise dispose of, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or Purchaser.

"Trustee" has the meaning set forth in the preamble hereof.

"Winning Bidder" has the meaning set forth in the Bidding Procedures.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1     Sale and Transfer of Purchased Assets; Excluded Assets.  On the terms and subject to the conditions set forth in this Agreement, and subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, Seller shall Transfer to Purchaser, and Purchaser shall purchase, acquire, assume and accept from Seller, to the extent permitted by the Bankruptcy Code, free and clear of all Liens and Liabilities (except for any Assumed Liabilities), all of the Estate's right, title and interest in and to the Purchased Assets (other than the Excluded Assets). Notwithstanding anything to the contrary herein, Seller shall retain and shall not convey, assign or transfer to Purchaser, and Purchaser shall not acquire or have any rights to acquire, any assets of Debtor or the Estate other than the Purchased Assets, including, but not limited to, any causes of action, any accounts or other receivables, any cash, cash equivalents or securities, any bank or other depository accounts, or any rights to Tax credits and/or Tax refunds (collectively, the "Excluded Assets").

Section 2.2     Assumed Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall convey, transfer, and assign to Purchaser, the following Liabilities of the Estate (the "Assumed Liabilities"):

(a)     all Liabilities arising under the Assigned Contracts, but only to the extent that such Liabilities arise and are required to be performed following the Closing and do not relate to any failure to perform, improper performance, breach of warranty or other breach, default or violation by Seller, Debtor

7

or the Estate, or any of their respective Affiliates, at or prior to the Closing (other than Cure Amounts in an aggregate amount not to exceed the Cure Cap);

(b)      all Liabilities arising out of the ownership or operation of the Purchased Assets, in each case, by Purchaser, solely to the extent arising from periods occurring after the Closing; and

(c)      the Cure Amounts in an aggregate amount not to exceed the Cure Cap.

Section 2.3      Excluded Liabilities.  Purchaser shall not assume and shall not be deemed to have assumed, nor shall Purchaser be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Actions against, Seller, the Estate, or Debtor, or any Liabilities of or Actions against, Seller, the Estate, or Debtor relating to the Purchased Assets, other than the Assumed Liabilities, including those Liabilities set forth below (collectively, the "Excluded Liabilities"):

(a)      all Liabilities of Seller or Debtor for Indebtedness;

(b)      all Liabilities for any Taxes of Seller or Debtor;

(c)      All Liabilities related to any Excluded Contracts; and

(d)      all Liabilities arising out of the ownership or operation of the Purchased Assets prior to the Closing (whether such Liability arises prior to or after the Closing), including any Liabilities with respect to any commercialization, sale or recall of any Product prior to the Closing and further including all Liabilities with respect to any returns, chargebacks, rebates arising from commercialization or sale of any Product prior to the Closing.

Section 2.4      Assignment of Assigned Contracts.

(a)      Schedule 2.4(a) sets forth a list of all executory Contracts to which Debtor is a party which, based upon Purchaser's designation, are to be included in the Assigned Contracts to be assumed and assigned to Purchaser.  Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to the Assigned Contracts and take all other actions necessary or otherwise required to cause such Assigned Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code (including (x) serving on all non-Seller counterparties to all of the Assigned Contracts a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Assigned Contract(s) and of the deadline for objecting to the Cure Amounts or any other aspect of the proposed assumption and assignment of their Assigned Contracts to Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code).  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts.

(b)      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.4, effective as of the Closing, Seller shall assume and assign the Assigned Contracts to Purchaser, and Purchaser shall assume all of the Assigned Contracts from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code and the Sale Order.

8

(c)     Purchaser shall have the right, subject to <u>Section 2.4(e)</u> and <u>Section 2.4(f)</u>, until one (1) Business Day prior to Closing to add any Contracts solely related to the Purchased Assets or remove any Contracts from Schedule 2.4(a) in the Purchaser's sole discretion.  Any Contracts timely added to Schedule 2.4(a) shall constitute Assigned Contracts, and any Contracts timely removed from Schedule 2.4(a) shall no longer constitute Assigned Contracts.  The addition or removal of a Contract from Section 2.4(a) shall not cause any adjustment to the Cash Purchase Price and the Purchaser shall be solely responsible for payment of any resulting Cure Amounts in excess of the Cure Cap due to the addition of a Contract to the Assigned Contracts.

(d)     Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (1) expires by its terms on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder, (2) requires Government Approval (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights under such Contract in accordance with Applicable Law, and such Government Approval has not been obtained, (3) to the extent that the assignment of all or any portion of the Contract shall be prohibited by law (including by Order of a Governmental Entity), or (4) requires a consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code.  In the event that any Contract that would otherwise have been assigned to Purchaser is deemed not to be assigned pursuant to clause (2) of the first sentence of this <u>Section 2.4(d)</u>, the Closing shall, subject to the satisfaction of the conditions set forth in <u>Article IX</u>, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (v) the time in which such Contract is deemed rejected, (w) such time as such Government Approval is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by Purchaser and (z) the closing of the Bankruptcy Case.  Seller and Purchaser shall (A) use reasonable efforts to secure such Government Approval as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contracts with respect to which the Government Approval has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract from and after the Closing (as if such Assigned Contracts had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon satisfying any requisite Government Approval requirement applicable to such Assigned Contracts after the Closing, such Assigned Contracts shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration.  Without limitation of the foregoing, prior to the Closing, Seller shall cooperate with Purchaser in connection with obtaining any consent, including by providing Purchaser with reasonable access to and facilitating discussions with the applicable counterparties (provided Purchaser shall provide Seller a reasonable opportunity to consult with Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such consents, and shall use reasonable efforts to assist Purchaser with obtaining such consents as promptly as practicable after the date hereof and prior to the Closing.

(e)     In the event of an objection by a Contract counterparty to the Cure Amount asserted by Seller with regard to any Contract (such contract, a "<u>Disputed Contract</u>"), Seller shall either settle the objection of such party or shall litigate such objection under procedures as established by the Bankruptcy Court. In no event shall Seller settle a Cure Amount objection with regard to any Assigned Contract without the express prior written consent of Purchaser (with an email consent being sufficient). In the event that a

9

dispute regarding the Cure Amounts with respect to an Assigned Contract has not been resolved as of the Closing, the Parties shall nonetheless remain obligated to consummate the transactions contemplated by this Agreement. Upon entry of an Order of the Bankruptcy Court determining any Cure Amount and authorizing the assumption and assignment to Purchaser of such Disputed Contract after the Closing, which order shall be in a form and substance that is satisfactory to Purchaser (a "Disputed Contract Order"), Purchaser shall have the option to designate the Disputed Contract as an Assigned Contract or an Excluded Contract (regardless of whether such Disputed Contract was set forth on Schedule 2.4(a)). If Purchaser elects to designate the Disputed Contract as an Excluded Contract, (a) such Disputed Contract shall automatically be deemed to be an Excluded Contract for all purposes under the Sale Order and this Agreement, and (b) Seller shall not be obligated to assume and Purchaser shall not be obligated to pay any Cure Amount or liabilities associated with such Disputed Contract. If Purchaser elects to designate the Disputed Contract as an Assigned Contract, such Disputed Contract shall be deemed an Assigned Contract for all purposes hereunder and, for the avoidance of doubt, Purchaser shall assume the Disputed Contract and shall pay the associated Cure Amount (if any); *provided, however,* that if Purchaser does not designate such Disputed Contract as either an Excluded Contract or a Assigned Contract within fifteen (15) Business Days after the date of the Disputed Contract Order (or such later date as agreed by the Seller and Purchaser), (a) such Disputed Contract shall automatically be deemed to be an Excluded Contract for all purposes under the Sale Order and this Agreement, and (b) Purchaser shall not be obligated to pay any Cure Amount associated with such Disputed Contract.

(f)        If at any time prior to the closing of the Bankruptcy Case, it is discovered that a Contract relating to the Product was not made known by Seller to Purchaser (any such Contract, a "Previously Unknown Contract"), Seller shall, promptly following the discovery thereof (but in no event later than three (3) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Unknown Contract and provide Purchaser with a copy of such Previously Unknown Contract and the Cure Amount (if any) in respect thereof. Purchaser shall thereafter deliver written notice to Seller (email being sufficient), no later than ten (10) Business Days following such notice of such Previously Unknown Contract from Seller, if Purchaser elects for such Previously Unknown Contract to be an Assigned Contract. If Purchaser elects for a Previously Unknown Contract to be a Assigned Contract in accordance with this Section, and the time for assumption and assignment of executory contracts has not elapsed, Seller shall file and serve an assignment and assumption notice on the Contract counterparty to such Previously Unknown Contract (a "Supplemental Assignment Notice") notifying such Contract counterparty of Seller's intention to assume and assign to Purchaser such Previously Unknown Contract, including the proposed Cure Amount (if any), and Seller shall use commercially reasonable efforts to cause the assignment of such Contract to Purchaser.  Any proposed order approving such assumption and assignment shall be in a form and substance that is satisfactory to Purchaser. Upon entry of such order, such Contract shall be deemed an Assigned Contract for all purposes under this Agreement and the Sale Order. If such Contract counterparty objects to the proposed assumption and assignment, the Contract at issue shall be deemed a Disputed Contract for all purposes under this Agreement.

(g)        The Sale Order shall contain language approving the assumption and assignment procedures with respect to Disputed Contracts and Previously Unknown Contracts as set forth in this Section 2.4.

(h)        Subject to entry of the Sale Order and consummation of the Closing, Purchaser shall, as soon as reasonably practicable after the date on which the Assigned Contracts have been assigned to Purchaser, pay the Cure Amounts, in an aggregate amount not to exceed the Cure Cap, directly to the applicable counterparties to such Assigned Contracts.  To the extent the Cure Amounts in the aggregate exceed the Cure Cap, Purchaser may pay the Cure Amounts in excess of the Cure Cap or, at Purchaser's election, designate the Contract as an Excluded Contract.

10

(i)      Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts.  Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's advisors available to testify before the Bankruptcy Court.

(j)      Under no circumstance shall this Agreement be construed to obligate the Seller to assume any Contract that is an Excluded Contract or that is not otherwise assigned to Purchaser.

## ARTICLE III

## CONSIDERATION

Section 3.1      Purchase Price.  The aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") will be (a) Six Million Seven Hundred Thousand Dollars ($6,700,000) in cash (the "Cash Purchase Price"), plus (b) the assumption by Purchaser of the Assumed Liabilities (including the payment by Purchaser of the Cure Amounts in an aggregate amount not to exceed the Cure Cap).

Section 3.2      Required Deposit; Payment of the Consideration.

(a)      On or prior to the date hereof, Purchaser has delivered to Wyrick Robbins Yates & Ponton LLP, special counsel to the Trustee (the "Escrow Agent"), by wire transfer of immediately available funds, the sum of $670,000 (the "Required Deposit"), to be held pursuant to the terms of this Agreement and released, without the accrual or payment of any interest, only upon a joint written instruction of Purchaser and Seller or an order of the Bankruptcy Court. At the Closing, Purchaser and Seller shall jointly instruct the Escrow Agent to release the Required Deposit from escrow and pay it to an account designated by Seller.

(b)      At the Closing, Purchaser shall pay to Seller, by wire transfer of immediately available funds to an account or accounts designated in writing by Seller prior to the Closing Date, an amount equal to the Purchase Price (subject to Section 2.4) less the Required Deposit.

Section 3.3      Post-Closing Allocation of Purchase Price.  Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Purchased Assets in accordance with Section 1060 of the IRS Code and the treasury regulations promulgated thereunder (such statement, the "Allocation Statement"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed.  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position for tax purposes inconsistent therewith.  If the IRS or any other Tax Authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the IRS Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner

11

consistent with the terms of this Section 3.3; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 3.3 in any Tax Return, in any refund claim or in any tax litigation. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets by the Trustee for the purpose of his administration of the Bankruptcy Case by way of liquidation, reorganization or otherwise.

Section 3.4    Withholding.    Purchaser shall pay all consideration payable pursuant to this Agreement free and clear of any withholding Tax, except as required by Applicable Law. Any Tax withheld and remitted to the applicable Governmental Entity shall be treated as an amount paid to the Person in respect of which such withholding was made.

## ARTICLE IV

## CLOSING

Section 4.1    Closing.

(a)    Upon the terms and subject to the conditions of this Agreement, the Closing shall take place remotely by electronic exchange of counterpart signature pages at 10:00 a.m. Eastern Time on the Closing Date, or  at such other time and/or in such other manner as may be agreed in writing by each of the parties hereto.

(b)    The Closing shall occur on or before the date (the "Closing Date") that is not later than the third Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article IX (other than conditions which by their nature can be satisfied only at the Closing).

(c)    If the Closing shall occur, Seller shall retain the Required Deposit and shall apply the Required Deposit toward the payment of the Purchase Price.

Section 4.2    Deliveries by Seller.    At the Closing, unless otherwise provided herein, Seller shall deliver or cause to be delivered to Purchaser (unless previously delivered) each of the following:

(a)    duly executed counterparts of the Bill of Sale, the Assignment and Assumption Agreement, and each other Conveyance Document;

(b)    the Purchased Assets;

(c)    the duly executed Release;

(d)    [reserved];

(e)    a certification of non-foreign status for the Estate in a form and manner that complies with the requirements of Section 1445 of the IRS Code and the treasury regulations promulgated thereunder;

(f)    [reserved];

(g)    an IRS Form W-9 or a certificate satisfying the requirements of Treasury Regulations Section 1.1445-2(b), duly executed by Debtor of any assets located in the United States (or, if a Seller or

12

Debtor is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), by the entity that is treated as the transferor of the relevant Purchased Assets); and

(h)  a certificate, dated as of the Closing Date and executed by Seller, certifying that the conditions in Section 9.2(a) and Section 9.2(b) have been satisfied.

Section 4.3  Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)  the Purchase Price (less the Required Deposit) by wire transfer of immediately available funds to an account designated by Seller;

(b)  duly executed counterparts of each applicable Conveyance Document in respect of the Purchased Assets;

(c)  [reserved]; and

(d)  the certificate referred to in Section 9.3(b).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

Section 5.1  Authorization; Enforceability.  Subject to the entry of the Sale Order, Seller has all requisite power and authority to enter into, execute and deliver this Agreement and any other document to which Seller, on behalf of the Estate, is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Seller of this Agreement and any other document to which Seller, on behalf of the Estate, is or is to be a party as required hereunder, and the consummation by Seller of the Transactions, have been duly authorized by all necessary action on the part of Seller.  This Agreement has been and, when executed and delivered, any other document to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each such other document) the valid and binding obligation of Seller, on behalf of the Estate, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 5.2  Title to Purchased Assets.  To Seller's actual knowledge, Seller has good and valid title to, or, in the case of leased assets, has a valid and enforceable leasehold interest in (subject to the effect on enforceability of (a) any Applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law)), the Purchased Assets, free and clear of all Liens upon entry of the Sale Order.  At the Closing or such time as title is conveyed under Section 4.2, Seller will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens, to the fullest extent permissible under section 363(f) of the Bankruptcy Code.  To Seller's actual knowledge, the Purchased Assets constitute substantially all of

13

the properties, assets and rights used by Debtor to develop, manufacture and otherwise commercialize the Product in the ordinary course of Debtor's business.  To Seller's actual knowledge, no Affiliates of Debtor or Seller hold any assets, properties or rights with respect to the Purchased Assets, and no other Person is engaged in the operation of, or holds rights, title or interest in, the Purchased Assets.

Section 5.3    Contracts.  To Seller's actual knowledge, neither Seller nor Debtor has assigned, delegated or otherwise transferred to any third party any of its respective rights or obligations with respect to any Assigned Contract.  To Seller's actual knowledge, each Assigned Contract is valid and binding on Debtor or its Affiliates party thereto, and, to the actual knowledge of Seller, each other party thereto, and is in full force and effect, assuming entry of the Sale Order.  To the actual knowledge of Seller, the Debtor or any other party thereto, has performed all material obligations required to be performed by it under each Assigned Contract, except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, or performance by the Debtor would be otherwise excused, assuming entry of the Sale Order.  Seller and, to the actual knowledge of Seller, neither the Debtor nor any other party to an Assigned Contract has commenced any Action in respect of any Assigned Contract or given or received any notice of any default or violation under any Assigned Contract that has not been withdrawn or dismissed, except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order.  To Seller's actual knowledge, there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller or Debtor, or, to the actual knowledge of Seller, the Debtor or any counterparty under any Assigned Contract. Seller has  not received any written (or, to the actual knowledge of Seller, oral) notice from any Person that such Person intends to terminate or not renew any Assigned Contract or materially reduce its business with respect to such Assigned Contract.  Subject to the terms of the Sale Order, each Assigned Contract is, and will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 5.4    Broker's, Finder's or Similar Fees.  There are no brokerage commissions, finder's fees or similar fees or commissions payable by or on behalf of Seller, the Estate or Debtor in connection with the Transactions.

Section 5.5    No Other Representations or Warranties.  EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE V OR IN THE SALE ORDER, PURCHASER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE PURCHASED ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS," AND ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE V OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE PURCHASED ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller as follows.

14

Section 6.1     <u>Organization</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 6.2     <u>Authorization; Enforceability</u>.   Purchaser has all requisite corporate power and authority to enter into this Agreement and any other document to which Purchaser is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary action on the part of Purchaser.  This Agreement and, when executed, any other document to which Purchaser is a party as required hereunder, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3     <u>No Conflicts</u>.   Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Purchaser or (b) result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound.

Section 6.4     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and any other document to which Purchaser is a party as required hereunder and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation by Purchaser of the Transactions, except the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e).

Section 6.5     <u>Broker's, Finder's or Similar Fees</u>.   There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

Section 6.6     <u>No Other Representations or Warranties</u>.   Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that none of Seller, on behalf of the Estate, the Estate's Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those set forth in <u>Article V</u>, or with respect to any other information provided to the Purchaser in connection with the Transactions, including as to the probable success or profitability of the ownership, use or operation of the Purchased Assets after Closing.  Purchaser further represents that none of Seller, on behalf of the Estate, the Estate's Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Seller or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, on behalf of the Estate, the Estate's Affiliates or any other Person will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including data room information provided to Purchaser or its Representatives, in connection with the Transactions.

15

## ARTICLE VII

## [RESERVED]

Section 7.1      [Reserved].

## ARTICLE VIII

## COVENANTS

Section 8.1      Tax Matters.

(a)      Purchaser shall be responsible for any Transfer Taxes.  Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the Transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions, and file all necessary Tax Returns with respect to all such Transfer Taxes.

(b)      Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)      Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any Tax Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.  Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 8.1(c).  Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets for any taxable period for which the other party may have liability under this Agreement.  Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any Tax Authority in connection with any Tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

Section 8.2      Maintenance of Assets.

(a)      Except as (i) required by Applicable Law, (ii) required by Order of the Bankruptcy Court or required, or authorized or restricted pursuant to the Bankruptcy Code or (iii) otherwise expressly required by this Agreement, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to ARTICLE X), unless Purchaser otherwise consents in writing, Seller shall, and shall to the extent practicable (A) maintain and preserve intact the Purchased Assets, (B) maintain, preserve, keep available and continue the services currently provided to Trustee that are necessary to maintain and preserve intact the Purchased Assets, (C) [reserved], (D) comply with the terms of, to the extent required by the Bankruptcy Code or Order of the Bankruptcy Court, all Contracts that may be subject to assumption by the Trustee and assignment to the Purchaser with suppliers, vendors, service providers, licensors, licensees, Governmental Entities, and other Persons, in each case, which are material to the Purchased Assets, (E) maintain and preserve in effect in all material respects the

16

Permits used or held for use that are material to the Purchased Assets, (F) [reserved], and (G) perform, to the extent required by the Bankruptcy Code or Order of the Bankruptcy Court, all of Debtor's obligations under the Assigned Contracts (including post-petition obligations under the Assigned Contracts).

(b)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates the right to control or direct Debtor's or its Affiliates' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Debtor the right to control or direct Purchaser's or its Affiliates' operations.

(c)     In furtherance of Section 8.2(a) and Section 8.2(b), during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to ARTICLE X), unless Purchaser otherwise consents in writing, Seller shall not, and shall cause the Debtor and its Affiliates not to, sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any other Person any property, right, privilege, interest or other asset that would otherwise constitute a Purchased Asset if owned immediately prior to the Closing.

Section 8.3     Access to Information.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to ARTICLE X), Seller shall, and shall cause the Debtor and its Affiliates to, provide Purchaser and its Representatives with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records (including work papers, schedules, memoranda, Tax Returns, Tax schedules and Tax rulings), documents, data, files, personnel and offices and properties of Debtor and its Affiliates, in order for Purchaser and its Representatives to access such information regarding Debtor or its Affiliates, the Purchased Assets or the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement or otherwise as reasonably requested by Purchaser in connection with Purchaser's actions provided for in this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of Debtor and its Affiliates, (ii) nothing herein will require Seller to provide access to or disclose, or cause the Debtor or its Affiliates to provide access to or disclose, any information to Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any Applicable Laws, or (C) would violate any fiduciary duty; provided further that Seller shall, or shall cause the Debtor or its Affiliates (as applicable) to, use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing.

(b)     Purchaser shall use any information provided pursuant to this Section 8.3 solely for the purpose of consummating the transactions contemplated hereby or in connection with Purchaser's actions provided for in this Agreement.

(c)     From and after the Closing until the closing of the Bankruptcy Case, Purchaser will, at Seller's sole expense, provide Seller and its Representatives with reasonable access, during normal business hours and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, and other documents transferred to Purchaser pursuant to this Agreement (for the purpose of examining and copying) relating to the Purchased Assets or the Assumed Liabilities, in each case, in Purchaser's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours and upon reasonable advance notice, to personnel, offices and properties of Purchaser, as may be reasonably requested by Seller in connection with the Bankruptcy Case, to comply with legal, regulatory, stock exchange and financial reporting requirements, or to satisfy any audit, accounting or similar requirement; provided, in each case, that such access does not unreasonably interfere with the normal operations of Purchaser or its Affiliates; provided

17

further that nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller if such access or disclosure (i) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (ii) would reasonably be expected to violate any Applicable Laws, (iii) would reasonably expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Purchaser or any of its Affiliates is bound, or (iv) would violate any fiduciary duty; provided that Purchaser will, and will cause its Subsidiaries to, use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand.

(d)     Unless otherwise consented to in writing by each other party, no party hereto, for the period from and after the Closing until the closing of the Bankruptcy Case, shall destroy, alter or otherwise dispose of any of the books and records relating to any period occurring on or prior to the Closing without providing reasonable advance notice to each other party and offering to permit each such other party (at such other party's sole cost and expense) to make copies of such books and records or any portion thereof that such party may intend to destroy, alter or dispose of.

(e)     From and after the Closing until the closing of the Bankruptcy Case, Seller shall, and shall cause the Debtor to, provide Purchaser and its Representatives with reasonable access (for the purpose of examining and copying), during normal business hours and upon reasonable advance notice, to the books and records including work papers, schedules, memoranda, and other documents relating to the Purchased Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Seller's, Debtor's or any of Debtor's Affiliates' possession or control (and solely to the extent concerning periods or occurrences prior to the Closing Date) as may be reasonably requested by Purchaser to (i) comply with legal, contractual, regulatory, stock exchange and financial reporting requirements, (ii) satisfy any audit, accounting or similar requirement, or (iii) satisfy any other bona fide legal compliance, accounting or tax purpose; provided that nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any Applicable Laws, or (C) would violate any fiduciary duty; provided that Seller will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand.

Section 8.4     [Reserved].

Section 8.5     Reasonable Efforts; Cooperation.

(a)     Without prejudice to any other term or provision of this Agreement, each party shall, and shall cause its Subsidiaries and its and their respective Representatives to, use its reasonable best efforts to perform their respective obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things reasonably necessary, proper or advisable to cause the Transactions to be effected as soon as reasonably practicable in accordance with the terms hereof, and to reasonably cooperate with each other party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)     The obligations of Seller pursuant to this Agreement, including this Section 8.5(b), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code.

18

Section 8.6    Notification of Certain Matters.

(a)    Seller shall promptly (and, in any event, within three (3) Business Days) notify Purchaser in writing: (i) of any notice or other communication received by Seller, Debtor or any Affiliate of Debtor from any Person alleging that the consent of such Person is or may be required in connection with the Transactions, (ii) of any notice or other communication received by Seller, Debtor or any Affiliate of Debtor from any Governmental Entity, or any Action, related to or in connection with the Transaction (including any such communication or Action that may restrain, enjoin or otherwise prohibit the consummation of the Transactions), and (iii) upon learning of the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any condition set forth in Section 9.2 not to be satisfied; provided that the delivery of any notice pursuant to this Section 8.6(a) shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date hereof or otherwise limit or affect the remedies available to Purchaser under or with respect to this Agreement.

(b)    Purchaser will promptly (and, in any event, within three (3) Business Days) notify Seller in writing (i) of any notice or other communication received by Purchaser from any Governmental Entity, or any Action, related to or in connection with the Transactions (including any such communication or Action that may restrain, enjoin or otherwise prohibit the consummation of the Transactions) and (ii) upon learning of the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any condition set forth in Section 9.3 not to be satisfied; provided that the delivery of any notice pursuant to this Section 8.6(b) shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date hereof or otherwise limit or affect the remedies available to Seller under or with respect to this Agreement.

Section 8.7    Misdirected Assets.  From and after the Closing, if Seller, Debtor or any Affiliate of Debtor receives any right, property or asset that is a Purchased Asset, Seller shall, or shall cause Debtor or such Affiliate to, promptly transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred.  From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset of Debtor that is not a Purchased Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller or Debtor, and such asset will be deemed the property of Seller or Debtor (as applicable) held in trust by Purchaser until so transferred.

Section 8.8    Further Assurances.  Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any party hereto and at such requesting party's expense, any other party hereto will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement and the transfer of title to the Purchased Assets to Purchaser or its designee(s) in accordance with the terms of the Agreement.

Section 8.9    Communications with Customers and Suppliers.  Subject to the terms of this Agreement, prior to the Closing, the parties hereto shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other counterparty with respect to the Assigned Contracts in relation to this Agreement and the transactions contemplated hereby.

Section 8.10    Release of Claims.  Notwithstanding anything herein to the contrary, at the Closing, Seller shall deliver to Purchaser a full, irrevocable and unconditional release of

19

Purchaser and its Affiliates, and each of their respective successors and assigns (individually and collectively, the "Purchaser Released Parties"), from any and all Liabilities, Actions, causes of action, damages, costs, claims, demands, expenses, commitments, debts, duties, and obligations of any kind or nature whatsoever, whether accrued or not, fixed or contingent, known or unknown, disclosed or undisclosed, matured or unmatured, asserted or unasserted, both at law and in equity, which Seller or the Estate had, has, or may after the Closing have, or claims to have or have had, against the respective Purchaser Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing, except, in each case, with respect to (i) any rights of Seller under this Agreement and any of the Conveyance Documents and (ii) fraud, gross negligence or willful misconduct of the Purchaser Released Parties.

Section 8.11    Bankruptcy Court Matters.

(a)    The Sale Order.  Seller shall use its best efforts to obtain entry of the Sale Order (provided Purchaser is the Winning Bidder), in form and substance acceptable to Purchaser in its sole discretion, as more fully set forth in Exhibit B, within two (2) Business Days after the Bankruptcy Court approves and authorizes the Transactions with the Purchaser at the Sale Hearing.

(b)    [Reserved].

(c)    Bankruptcy Court Filings.  Seller shall consult with Purchaser with respect to, and Purchaser shall have the right to approve in its sole and absolute discretion, the proposed Sale Order prior to the presentation of such Sale Order to the Bankruptcy Court.  Seller shall consult with Purchaser with respect to any other pleadings or proposed Orders to be presented to the Bankruptcy Court relating to the Transaction, and the bankruptcy proceedings in connection therewith, and provide Purchaser with copies of applications, pleadings, notices, proposed Orders and other documents to be filed by Seller in the Bankruptcy Case that relate in any way to this Agreement, the Transaction, the Bidding Procedures, the Bidding Procedures Order or the Sale Order prior to the making of any such filing with or submission to the Bankruptcy Court.

(d)    [Reserved].

(e)    Bankruptcy Actions.  Each of Seller and Purchaser shall appear formally in the Bankruptcy Court if reasonably requested by the other party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the transactions contemplated by this Agreement.

(f)    Approval.  Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of the Sale Order, and to the terms of the Sale Order and any other orders of the Bankruptcy Court applicable to the transactions contemplated in this Agreement. Nothing in this Agreement shall require Seller or its affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

20

## ARTICLE IX

## CONDITIONS

Section 9.1    Conditions Precedent to Performance.  The respective obligations of Seller and Purchaser to consummate the Transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by law, written waiver signed by each of Seller and Purchaser), on or prior to the Closing Date, of the following conditions:

(a)    Bankruptcy Matters.  By January 8, 2024, the Bankruptcy Court shall have entered the Sale Order.  The Sale Order shall have become final and shall not have been stayed, vacated, modified or supplemented without the prior written consent of Purchaser.

(b)    No Order.  No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of any of the Transactions contemplated by this Agreement or (ii) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect.  No action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the Transactions contemplated by this Agreement or (y) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2    Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties.  All representations and warranties made by Seller in ARTICLE V shall be true and correct in all material respects on and as of the Closing Date as if again made by Seller on and as of such date (or, if made as of a specific date, at and as of such date).

(b)    Performance.  Seller shall have performed in all material respects all obligations required under this Agreement to be performed by Seller on or before the Closing Date.

(c)    Deliverables.  Seller shall have delivered, and Purchaser shall have received, all of the items set forth in Section 4.2.

(d)    Assigned Contracts.  Seller shall have assigned to Purchaser the Assigned Contracts listed on Schedule 2.4(a), subject to Purchaser's provision of adequate assurance of future performance as required under Section 365 of the Bankruptcy Code, and except for the express contractual rights of the counterparties to the Assigned Contracts, no Person (other than Purchaser) will have any ownership or other interest in any Assigned Contract or otherwise with respect to the Purchased Assets.

(e)    Legal Proceedings.  No legal proceeding shall have been commenced against Purchaser, Seller, Debtor or any Subsidiary of Debtor which would prevent the Closing.  No Order shall have been issued by any Governmental Entity, and be in effect, which has the effect of making the Transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of this Transaction or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

The foregoing conditions in this Section 9.2 are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion.

Section 9.3    Conditions to Obligations of Seller.  The obligations of Seller to consummate the Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties.  All representations and warranties made by Purchaser in Article VI shall be true and correct in all material respects on and as of the Closing Date as if again made by Purchaser on and as of such date (or, if made as of a specific date, at and as of such date).

(b)    Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by an authorized signatory of Purchaser to that effect.

(c)    Purchaser's Deliveries.  Purchaser shall have delivered, and Seller shall have received, all of the items set forth in Section 4.3.

The foregoing conditions in this Section 9.3 are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion.

**ARTICLE X**

**TERMINATION**

Section 10.1    Termination.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)    By the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable efforts to prevent the entry of and remove) that permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions, and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    By Seller upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.3 and (ii) cannot be cured within two (2) Business Days after Seller provides written notice to Purchaser of such breach;

(d)    By Purchaser upon written notice given to Seller, if Seller shall have breached or failed to perform in any material respect any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.2 and (ii) is not cured within five (5) Business Days after Purchaser provides written notice to Seller of such breach;

22

(e)     By Purchaser upon written notice given to Seller, if Seller shall fail to file the Sale Motion with the Bankruptcy Court within three (3) Business Days following execution of this Agreement;

(f)     By Purchaser upon written notice given to Seller, if the Bankruptcy Court enters any Order materially inconsistent with the Bidding Procedures Order, the Sale Order, this Agreement or the Transaction, each as determined by Purchaser in its reasonable discretion;

(g)     By Purchaser upon written notice given to Seller, if any creditor of the Estate obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any portion of the Purchased Assets;

(h)     By either Purchaser or Seller, if, at the conclusion of the Sale Hearing, Purchaser is not determined by the Bankruptcy Court to be the Winning Bidder with respect to such Purchased Assets; and

(i)     By Purchaser or Seller upon written notice given to the other if Seller or Debtor consummates an Alternative Transaction.

For the avoidance of doubt, if Purchaser or Seller terminates this Agreement with respect to any individual or combination of Purchased Assets, the Agreement, as amended as permitted by the Bidding Procedures Order, shall remain in full force and effect for any Purchased Assets for which Purchaser is the Winning Bidder.  Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2     Effect of Termination; Required Deposit.

(a)     If this Agreement is terminated by Seller or Purchaser in accordance with and pursuant to Section 10.1, then all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination; provided further, that if this Agreement is terminated by Seller pursuant to Section 10.1(c), then Purchaser shall forfeit and Seller shall retain the Required Deposit as its sole and exclusive remedy for such breach.

(b)     If this Agreement is terminated pursuant to Section 10.1 (except pursuant to Section 10.1(c)), then Seller shall promptly (but in any event within three (3) Business Days after such termination) return the Required Deposit to Purchaser by wire transfer of immediately available funds to an account or accounts designated by Purchaser.

(c)     If this Agreement is terminated other than in a manner provided by Section 10.1, then, without limiting any other rights and remedies that may be available to Purchaser, then within five (5) Business Days after such termination, Seller shall refund the Required Deposit to Purchaser by wire transfer of immediately available funds to an account designated by Purchaser.

Section 10.3     [Reserved].

## ARTICLE XI

## MISCELLANEOUS

Section 11.1     Survival of Covenants, Representations and Warranties.   The representations and warranties set forth in Article V and Article VI shall not survive the Closing Date;

23

provided, however, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect until performed in accordance with their terms, unless otherwise specified therein.

Section 11.2    Fees and Expenses.  Except as expressly provided otherwise in this Agreement, each party hereto shall bear its own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Conveyance Documents and each other agreement, document and instrument contemplated by this Agreement, and/or the consummation of the Transactions.

Section 11.3    Amendment and Modification.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

Section 11.4    Notices.  All notices and other communications hereunder shall be in writing and mailed, delivered personally, emailed (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

If to Seller:          George F. Sanderson III, Chapter 7 Trustee
                       The Sanderson Law Firm, PLLC
                       P.O. Box 6130
                       Raleigh, NC 27628
                       Email:  george@georgesandersonlaw.com

with a copy (which shall not constitute notice) to:

                       Wyrick Robbins Yates & Ponton LLP
                       4101 Lake Boone Trail, Suite 300
                       Raleigh, NC 27607
                       Attn:  Donald R. Reynolds
                       Email:  dreynolds@wyrick.com

If to Purchaser:       Helicore Bioventures I, Inc.
                       618 Creekside Lane
                       Fishkill, NY 12524
                       Attn:  Jing Liang and Patrick Crutcher
                       Email:  jing.liang@umbrex.com
                               pc@chymabio.com

with a copy (which shall not constitute notice) to:

                       K&L Gates LLP
                       301 Hillsborough Street, Suite 1200
                       Raleigh, NC 27603
                       Attn:  A. Lee Hogewood, III and Emily K. Steele
                       Email:  a.lee.hogewoodiii@klgates.com
                               emily.steele@klgates.com

24

or to such other address as a party may from time to time designate in writing in accordance with this Section 11.4. Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or email during normal business hours of the recipient (otherwise, on the first Business Day thereafter), or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt. The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 11.4, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 11.5    Counterparts. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 11.6    Mutual Drafting. This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

Section 11.7    Entire Agreement; No Third Party Beneficiaries. This Agreement and other schedules, annexes, and exhibits hereto, any other document required hereunder, the Conveyance Documents and the Sale Order (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (b) are not intended to confer upon any Person other than the parties hereto and thereto any rights, obligations or remedies hereunder; provided, that (x) the Purchaser Released Parties (other than Purchaser) are express third-party beneficiaries of Section 8.10 and (y) the Affiliates and representatives of each party are express third-party beneficiaries of Section 11.15 and this Section 11.7.

Section 11.8    Severability. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.9    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.10    Exclusive Jurisdiction. All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of

an inconvenient forum to the maintenance of any such action or proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the Eastern District of North Carolina, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 11.4 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

Section 11.11   Remedies. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 11.12   Specific Performance.

(a)      Purchaser acknowledges and agrees that any breach of the terms of this Agreement by Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Seller shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond. Seller acknowledges and agrees that any breach of the terms of this Agreement by Seller would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Purchaser shall be entitled to enforce the terms of this Agreement, including by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)      Each party hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. In the event a party hereto seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, such party shall not be required to provide any bond or other security in connection with any such order or injunction.

Section 11.13   Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties; provided that no such prior written consent shall be required for (a) an assignment by Purchaser to one or more of its Affiliates, so long as Purchaser remains liable hereunder, or (b) an assignment by Purchaser of its rights and interests hereunder after the Closing. Subject to the first sentence of this Section 11.13, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

26

Section 11.14   Headings.   The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.15   No Consequential or Punitive Damages.   NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 11.16   Bulk Transfer Notices.   Seller and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 11.17   Interpretation.

(a)   When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)   Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)   The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)   The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)   A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f)   A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)   References to $ are to United States Dollars.

(h)   The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Remainder of page intentionally left blank]

27

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

GEORGE F. SANDERSON, AS TRUSTEE FOR THE ESTATE

By: _____

      Name: George F. Sanderson
      Title:  Trustee

**PURCHASER:**

HELICORE BIOVENTURES I, INC.

By: _____

      Name: Jing Liang
      Title:  Chief Executive Officer

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

GEORGE F. SANDERSON, AS TRUSTEE FOR THE ESTATE

By: _____
     Name:
     Title:

**PURCHASER:**

HELICORE BIOVENTURES I, INC.

By: _____
     Name: Jing Liang
     Title:   Chief Executive Officer

[*Signature Page to Asset Purchase Agreement*]

**Schedule 2.1**

**Purchased Assets**

All of the Estate's right, title and interest in and to:

1.  The Product.

2.  The Marketing Authorizations.

3.  The Assumed Liabilities.

4.  The Assigned Contracts.

5.  All Regulatory Documentation.

6.  Without limiting the foregoing, all files, records, information, books, ledgers, documents, work papers, correspondence, invoices, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, complaint files, manufacturing and packaging batch records, quality investigation documents and reports, adverse event investigations and reports, pharmacovigilance documents and reports, clinical and pre-clinical data, and any other data, reports and similar materials owned by Seller, the Estate, Debtor, or any Affiliate of Debtor, in each case to the extent related to the Product and not related to any product that is not the Product, whether in the physical possession of Seller, the Estate, Debtor, any Affiliate of Debtor, or third party contractor.

7.  All Patent Rights, trademarks, technology, trade secrets, Know-How, proprietary information and other intellectual property rights owned by Seller, the Estate, Debtor or any Affiliate of Debtor in connection with the Product.

8.  All inventory with respect to the Product (including active pharmaceutical ingredients, finished goods, all bulk and vialed inventory, supplies, raw materials, samples, work in progress, cell lines and component parts) owned by Seller, the Estate, Debtor or any Affiliate of Debtor, whether in the physical possession of Seller, the Estate, Debtor, any Affiliate of Debtor, or third party contractor.

**Schedules**

**Schedule 2.4(a)**

**Assigned Contracts**

1. AIT Bioscience, LLC

2. Altasciences Preclinical Seattle, LLC

3. ATUM Bio

4. Charles River Laboratories

5. Creative Biolabs

6. KBI-Biopharma Inc.

7. Lyophilization Services of NE Inc.

8. Amended and Restated Technology License Agreement, dated as of July 14, 2021, by and between 9 Meters Biopharma, Inc., as assignee of Lobesity LLC, and MetroHealth Ventures LLC f/k/a MHS Care-Innovation LLC (as the same may be amended, revised, supplemented or modified from time to time)

**Schedules**

**EXHIBIT A-1**

**<u>Form of Assignment and Assumption Agreement</u>**

[Attached]

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (this "<u>Agreement</u>") is dated and effective as of January __, 2024, by and between George F. Sanderson, as the chapter 7 trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of the chapter 7 bankruptcy estate (the "<u>Estate</u>") of 9 Meters Biopharma, Inc., a Delaware corporation, and Helicore Bioventures I, Inc., a Delaware corporation ("<u>Buyer</u>").

**<u>Recital</u>**

Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of January 5, 2024 (the "<u>Purchase Agreement</u>"), pursuant to which Seller has agreed to sell, assign and transfer the Purchased Assets, including the Assigned Contracts, to Buyer, and Buyer has agreed to purchase the Purchased Assets, including the Assigned Contracts, all on the terms and subject to the conditions set forth in the Purchase Agreement and in accordance with Sections 105, 363 and 365 of chapter 7 of the Bankruptcy Code, as amended. Pursuant to the Purchase Agreement, as part of the consideration for the Purchased Assets, Buyer will assume the Assumed Liabilities. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

**<u>Agreement</u>**

NOW, THEREFORE, in consideration of the above premise and of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Assignment and Assumption</u>.  At the Closing, upon the terms and subject to the conditions contained in the Purchase Agreement, Seller does hereby sell, assign, transfer and convey unto Buyer all right, title and interest of Seller in and to the Assigned Contracts.  Buyer hereby accepts the foregoing assignment, and, in connection therewith, Buyer does hereby assume, agree and undertake to perform, pay, satisfy and discharge when due, in accordance with their terms, the Assumed Liabilities. Buyer does not assume or in any way undertake to pay, perform, satisfy or discharge any Excluded Liabilities.

2. <u>Further Assurances</u>.  Each of Seller and Buyer hereby covenants that, from time to time after the delivery of this instrument, at the reasonable request of the other party, each party will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers, and assignments as the other party may reasonably request to effect, consummate, confirm or evidence the transfer of the Assumed Liabilities to, and the assumption of the Assumed Liabilities by, Buyer in accordance with the foregoing and otherwise to carry out the intentions and purposes of the Purchase Agreement.

3. <u>Purchase Agreement</u>.  Nothing contained in this Agreement shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever.  This Agreement does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement with respect to the Purchased Assets and the Assumed

035355.0002-3894615v1

Liabilities.  In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

4.  Third-Party Beneficiaries.  Nothing contained herein shall confer any rights on any third party or in any way enhance or expand the rights of any third party with respect to any of the Assumed Liabilities.

5.  Successor and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

7.  Counterparts; Electronic Delivery.  This Agreement may be executed in any number of counterparts with the same effect as if each of the parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one Agreement.  This Agreement, to the extent signed and delivered by means of electronic transmission (including electronic mail of .pdf files or any electronic signature complying the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party hereto shall raise the use of electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

[Remainder of page intentionally left blank]

035355.0002-3894615v1

2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

<div style="margin-left: 45%">

SELLER:

GEORGE F. SANDERSON, AS TRUSTEE FOR THE ESTATE

By: _____

     Name:    George F. Sanderson
     Title:    Trustee

BUYER:

HELICORE BIOVENTURES I, INC.

By: _____

     Name:    Jing Liang
     Title:    Chief Executive Officer

</div>

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT A-2**

**<u>Form of Bill of Sale</u>**

[Attached]

**Exhibits**

**BILL OF SALE**

This Bill of Sale (this "<u>Bill of Sale</u>") is dated and effective as of January __, 2024, by and between George F. Sanderson, as the chapter 7 trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of the chapter 7 bankruptcy estate (the "<u>Estate</u>") of 9 Meters Biopharma, Inc., a Delaware corporation, and Helicore Bioventures I, Inc., a Delaware corporation ("<u>Buyer</u>").

### <u>Recital</u>

Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of January 5, 2024 (the "<u>Purchase Agreement</u>"), pursuant to which Seller has agreed to sell, transfer and assign the Purchased Assets to Buyer, and Buyer has agreed to purchase the Purchased Assets from Seller, all on the terms and subject to the conditions set forth in the Purchase Agreement and in accordance with Sections 105, 363 and 365 of chapter 7 of the Bankruptcy Code, as amended. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

### <u>Agreement</u>

NOW, THEREFORE, in consideration of the above premise and of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      <u>Conveyance</u>.  At the Closing, upon the terms and subject to the conditions contained in the Purchase Agreement, Seller does hereby sell, assign, transfer and convey unto Buyer, and Buyer does hereby purchase from Seller, in accordance with the Purchase Agreement, all right, title and interest of Seller in and to the Purchased Assets (other than the Excluded Assets), free and clear of all Liens and Liabilities (except for any Assumed Liabilities).

2.      <u>Further Assurances</u>.  Seller hereby covenants that, from time to time after the delivery of this instrument, at Buyer's reasonable request, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers, and assignments as Buyer may reasonably request to sell, assign, transfer and deliver to Buyer, and to put Buyer in possession of, any of the Purchased Assets.

3.      <u>Purchase Agreement</u>.  Nothing contained in this Bill of Sale shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever.  This Bill of Sale does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement with respect to the Purchased Assets and the Assumed Liabilities.  In the event of any conflict or other difference between the Purchase Agreement and this Bill of Sale, the provisions of the Purchase Agreement shall control.

4.      <u>Successor and Assigns</u>.  This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

035355.0002-3894614v1

5.      <u>Governing Law</u>.   This Bill of Sale shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

6.      <u>Counterparts; Electronic Delivery</u>.   This Bill of Sale may be executed in any number of counterparts with the same effect as if each of the parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one Bill of Sale.  This Bill of Sale, to the extent signed and delivered by means of electronic transmission (including electronic mail of .pdf files or any electronic signature complying the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party hereto shall raise the use of electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

[Remainder of page intentionally left blank]

035355.0002-3894614v1                                        2

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale as of the day and year first above written.

SELLER:

GEORGE F. SANDERSON, AS TRUSTEE FOR THE ESTATE

By: _____
  Name: George F. Sanderson
  Title: Trustee

BUYER:

HELICORE BIOVENTURES I, INC.

By: _____
  Name: Jing Liang
  Title: Chief Executive Officer

[Signature Page to Bill of Sale]

**EXHIBIT B**

**Sale Order**

[Attached]

**Exhibits**

**EXHIBIT B**

**CURE AMOUNTS FOR ASSIGNED CONTRACTS**

1. AIT Bioscience, LLC— **$0**

2. Altasciences Preclinical Seattle, LLC— **$1,865,705.69**

3. ATUM Bio— **$0**

4. Charles River Laboratories— **$0**

5. Creative Biolabs— **$42,762.00**

6. KBI-Biopharma Inc. — **$3,661,372.66**

7. Lyophilization Services of NE Inc.— **$124,069.16**

8. Amended and Restated Technology License Agreement, dated as of July 14, 2021, by and between 9 Meters Biopharma, Inc., as assignee of Lobesity LLC, and MetroHealth Ventures LLC f/k/a MHS Care-Innovation LLC (as the same may be amended, revised, supplemented or modified from time to time)— **$0**