## **EXHIBIT 2**

[See attached]

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 23-10937 (LSS)
 4   NOVAN, INC., et al.           .
                                   .  Courtroom No. 7
 5                                 .  824 Market Street
                         Debtor.   .  Wilmington, Delaware 19801
 6                                 .
                                   .  Monday, September 11, 2023
 7   . . . . . . . . . . . . . . . .  10:00 a.m.

 8

 9                        TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                     UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:           Derek Abbott, Esquire
                               MORRIS NICHOLS ARSHT & TUNNELL, LLP
13                             1201 Market Street, 16th Floor
                               Wilmington, Delaware 19801
14
     For Aclaris:             Aaron Appelbaum, Esquire
15                            DLA PIPER
                              1201 North Market Street
16                            Suite 2100
                              Wilmington, Delaware 19801
17
     (APPEARANCES CONTINUED)
18
     Audio Operator:          Mandy Bartkowski, ECRO
19
     Transcription Company:   Reliable
20                            The Nemours Building
                              1007 N. Orange Street, Suite 110
21                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
22                            Email:  gmatthews@reliable-co.com

23   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
24

25
```

```
 1   APPEARANCES (CONTINUED):

 2   For Reedy Creek:          Matthew Goeller, Esquire
     Investments LLC          K&L GATES LLP.
 3                            600 N. King St., Suite 901
                              Wilmington, DE. 19801
 4
                              -and-
 5
                              Brandy Sargent, Esquire
 6                            K&L GATES LLP
                              One SW Columbia Street
 7                            Suite 1900
                              Portland, Oregon 97204
 8

 9   For Mayne Pharma LLC      Lee Hogewood, Esquire
                              John R. Gardner, Esquire
10                            K&L GATES LLP
                              301 Hillsborough Street,
11                            Suite 1200
                              Raleigh, North Carolina 27603
12
     For the Official
13   of Unsecured Committee    Donald J. Detweiler, Esq.
     Creditors:               WOMBLE BOND DICKINSON (US), LLP
14                            1313 North Market Street
                              Suite 1200
15                            Wilmington, Delaware 19801

16                            -and-

17                            James F. Lathrop, Esquire
                              Stacy Dasaro, Esquire
18                            Goodwin & Procter
                              620 Eighth Avenue
19                            New York City, NY 10018

20

21   For the U.S. Trustee:     Linda J. Casey, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
22                            OFFICES OF THE UNITED STATES TRUSTEE
                              J. Caleb Boggs Federal Building
23                            844 King Street
                              Suite 2207, Lockbox 35
24                            Wilmington, Delaware 19801

25
```

1                              INDEX

2  MOTIONS:                                              PAGE

3   Agenda    Court Decision - Order Approving Sale       66
    Item

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                              INDEX

2    WITNESSES CALLED
     BY DEBTOR:                                        PAGE
3

4         PAULA BROWN STAFFORD

5         Direct examination by Mr. Abbott              10

6         Cross-examination by Mr. Appelbaum            16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                EXHIBITS

2    CABLE PARK'S EXHIBITS:                                    PAGE

3      1 - Stafford Declaration                                  9

4      2 - Wein Declaration                                      9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:07 a.m.)

2               THE COURT:  Mr. Abbott.

3               MR. ABBOTT:  Good morning, Your Honor.  Derek

4    Abbott, of Morris Nichols, here for the debtors.

5               Your Honor, today is the day set for a Sale

6    hearing for substantially all of the debtor's assets.

7               Your Honor, early this morning, we filed a second

8    amended agent that reflected a little bit of a last-minute

9    flurry of papers over the weekend.

10               I just wanted to make sure that the Court had

11    received that.

12               THE COURT:  I don't know, but I'm aware of the

13    flurry of papers that happened over the weekend.

14               MR. ABBOTT:  Fair enough, Your Honor.  Just a

15    quick review, if I may, Your Honor.

16               These cases filed on July 17th.  We had a First

17    Day hearing on July 19th.  At that hearing, we discussed some

18    unorthodox features of a sale process.  We discussed those

19    again by Judge Shannon at the Sale Procedures hearing, after

20    which he entered a Revised Sale Procedures Order on August

21    15th.

22               The sale procedures that were entered and the

23    order that was entered by Judge Shannon reflected substantial

24    concessions by Ligand that were negotiated with the Committee

25    and, collectively, Your Honor, we believe that, with all

1    those concessions, and assuming that these sales close, there

2    should be a modest recovery for unsecured creditors in these

3    cases.

4            Your Honor, as set forth in the Declaration of

5    Simon Wein, the sale process played out largely in accordance

6    with the sale procedures order.

7            I need to note one correction to that Declaration,

8    if I may, Your Honor, and I should've caught it but I didn't,

9    Your Honor.  That Declaration indicated that there were

10   backup bidders identified at the auction.  There were not

11   because there was no actual bidding at the auction.  The

12   auction was open and closed and the bids we have before the

13   Court today were bids that were submitted by the bid

14   deadline, negotiated modestly, but there was no auction, Your

15   Honor, because there were no competing bids for the same

16   assets.

17           We are here today for the approval of two asset

18   sales.  One is the Ligand, who is our stalking horse for what

19   we'd call the R&D assets, including, notably, SB-206, and

20   also Sitavig, which was a commercial product that they wanted

21   to buy.  The purchase price for those two is $12,150,000.

22           The second transaction we seek to approve is the

23   purchase of certain commercial assets associated with the

24   Rhofade product, Your Honor.  That purchase price is $8

25   million, plus cure costs of up to $1 1/2 million.

8

1  Notwithstanding a fairly robust process, as articulated in

2  Mr. Wein's Declaration, there are a handful of remaining

3  commercial assets that were unsold, including Cloderm and

4  Minolira.  They may be the subject of a later sale, or

5  perhaps may vest in a liquidating trust under a Plan.  We've

6  not determined that, but they are not being sold today.

7            I believe, at this point, Your Honor, there's only

8  one outstanding objection and that is the objection of

9  Aclaris.  That was what all those late filings were about.

10           In support of our sale motion, Your Honor, I would

11 like to move into evidence the First Day Declaration of Ms.

12 Stafford.  That appears at Docket Item Number 4.  I would

13 also like to move in the Declaration of Simon Wein, filed in

14 support of the sale.  That's Docket Item 273, as corrected by

15 me on the record today, Your Honor.

16           And finally, I have some very brief testimony from

17 Ms. Stafford I'd just like to put on perhaps before argument

18 and then we could get to the argument.  I'm at the Court's

19 pleasure on how you wish to proceed.

20           THE COURT:  Okay.  Well, let me hear if there are

21 any objections to the Declaration of Ms. Stafford, her First

22 Day Declaration, or the Declaration of Simon Wein coming into

23 evidence.

24           MR. LATHROP:  Good afternoon, Your Honor.  James

25 Lathrop, of Goodwin Procter, for the Official Committee of

9

1   Unsecured Creditors.

2           Your Honor, the Committee doesn't oppose the

3   admission of the Wein Declaration for the limited purpose --

4   for the express purpose of these sale orders. However, the

5   Committee does take issue with certain representations in the

6   Wein Declaration regarding the role of the alternative

7   stalking horse proposals.

8           Accordingly, the Committee would just like to

9   reserve all rights regarding the Wein Declaration for any

10  purposes other than these sale orders.

11          THE COURT:  Okay.  Is there anyone else?

12          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

13  No objection from Aclaris to the admission to either

14  declaration.

15          THE COURT:  Okay.  Thank you.  I know I read the

16  Wein Declaration but I do not seem to have a copy of it.  Do

17  you have an extra copy of his Declaration?

18          MR. ABBOTT:  We'll hand that up in a moment, Your

19  Honor.

20          THE COURT:  Okay.

21          MR. ABBOTT:  May I approach, Your Honor?

22          THE COURT:  Yes.  Thank you.  There being no

23  objection, those two declarations are admitted, subject to

24  cross examination.

25  (Debtor's Exhibits 1 and 2 received into evidence)

1    MR. ABBOTT:  Shall I call Ms. Stafford now, Your

2  Honor?

3    THE COURT:  Let's get the evidence in.  Does

4  anyone wish to cross examine Mr. Wein?

5    (No verbal response)

6    THE COURT:  Okay.  I hear no one.  Then let's put

7  Ms. Stafford on -- or you're going to proffer?

8    MR. ABBOTT:  Your Honor, I'm happy to just call

9  her.

10    THE COURT:  Okay.

11    MR. ABBOTT:  That's fine.  And I would -- the

12  debtors would call Ms. Stafford to the stand.

13    THE COURT:  Okay.  Ms. Stafford, please take the

14  stand.

15    THE CLERK:  Please raise your right hand.  Please

16  state your full name and spell your last name for the record.

17    MS. STAFFORD:  Paula Brown Stafford, S-T-A-F-F-O-

18  R-D.

19  PAULA BROWN STAFFORD, PLAINTIFF'S WITNESS, AFFIRMED.

20    THE CLERK:  Thank you.  Please be seated.

21                    DIRECT EXAMINATION

22  BY MR. ABBOTT:

23  Q    Ms. Stafford, how are you employed?

24  A    I am the Chairman, President, and CEO of Novan, Inc.

25  Q    And can you just summarize briefly your history at

1   Novan?

2   A     Sure.  I joined as a consultant for about a month,

3   after 32 years in the industry, in 2017, and a month after

4   that, I joined part-time as the Chief Development Officer.

5   At the beginning of 2019, I became the COO, President and

6   COO.  And then in February of 2020, I became the CEO and then

7   in July of 2020, became the Chairman.

8   Q     And in your role as CEO, have you been involved in the

9   sale process conducted by Novan before and after the

10  petitions were filed in these cases?

11  A     Yes I have.

12  Q     Can you describe how?

13  A     Well, since I became the CEO in 2020, I've been trying

14  to sell assets of the company, being the best way to move

15  these products into potential approval by the FDA, so engaged

16  a different bank, not Raymond James, a different bank in

17  2020, and went through a full sale process.

18        And then, you know, more actively, in 2022 and 2023,

19  beginning of, tried through -- because dermatology is a --

20  you know, pretty small area and there were a finite number of

21  companies really in that area and so we were trying to sell

22  on our own.  And then we retained Raymond James June 10th of

23  2023 to, you know, try to more formally divest of the assets.

24  Q     And have you had an opportunity to review the

25  Declaration of Mr. Wein, of Raymond James, that was filed in

1  support of the sale motion today?

2  A     Yes I have.

3  Q     And if you testified to describe the sale process,

4  would you describe it as he did in his declaration?

5  A     Yes I would.

6  Q     Have you had an opportunity in your role as CEO to

7  consider the two transactions that are before the Court

8  today; the first being the R&D assets, plus Sitavig, for sale

9  to Ligand, and the second being the sale of the Rhofade

10 associated assets to Mayne?

11 A     Yes I have.

12 Q     Do you believe that those reflect the maximum value

13 obtainable for these assets by the company?

14 A     Yes; somewhat, unfortunately.  Of course, I believe

15 they're worth more, but I think there was a very robust

16 process.  You know, three -- I'll just say that since July

17 1st, there have been three public companies in Research

18 Triangle Park, North Carolina, that have too filed Chapter 11

19 and one just de-listed with NASDAQ.  It's a tough time.

20       If you will, a fourth CEO in the area emailed me on

21 Friday because the sale hearing was coming.  It was published

22 in our local business journal about the case and about these

23 two -- the bifurcation and the two, you know, if you will,

24 winners.  And I had another CEO write me an email on Friday

25 and it really -- I'm sorry to go on, but said, you know, that

13

1   you got -- amazing that you got what you did for the

2   stakeholders; that it's not easy, and it's a sizable amount,

3   and that was -- you know, felt good, I have to say, that

4   somebody else felt the same, so.

5   Q     Do you believe that the debtor's entry into those

6   transactions would be in the best interest of the estate's

7   creditors?

8   A     I do.

9   Q     And is it your business judgment that those

10  transactions are the best that the debtors are able to do

11  with these assets today?

12  A     I do.

13  Q     Did you discuss those offers with the company's board?

14  A     Yes.  We took it to the board and they approved.

15  Q     Just a little housekeeping.  To your knowledge, are

16  either of the buyers insiders or affiliates of the debtors?

17  A     No they are not.

18  Q     How would you characterize the negotiations between the

19  debtors and the respective buyers?

20  A     It was really through our attorneys and with the, you

21  know, help of Raymond James and, you know -- you know,

22  negotiating quite a bit to try to get where we got to.  So

23  there was a lot of negotiation, you know, pushing back and

24  forth, and really trying to get what we could for our

25  stakeholders and I think we have the opportunity for a pretty

1  sizable amount.

2  Q     Would you characterize those discussions as arm's

3  length?

4  A     Yes.

5  Q     Shifting gears, I want to talk a little bit about

6  Aclaris.  Are you aware of a business relationship between

7  the estates and Aclaris Therapeutics?

8  A     Yes.

9  Q     Can you describe generally that business relationship?

10  A     Yes.  So, in March of 2022, Novan acquired EPI Health.

11  EPI Health had agreements with several companies because of

12  the Rhofade asset and how it had moved through.  They

13  acquired the rights to Rhofade in August of 20 -- I'm sorry,

14  October of 2019 and then we acquired in March of 2022.

15  Q     And have you been involved with or overseen the EPI

16  business as it relates to Aclaris during your tenure as the

17  CEO and Chairman of Novan?

18  A     Yes.  The President of EPI Health reported -- reports

19  to me, as the COO of Novan, and the -- was the President of

20  EPI Health .

21  Q     And what, if any, ongoing relationship has there been

22  with Aclaris since your tenure as CEO?

23  A     It's been very limited.  There have been some emails

24  and phone calls, requests for information, but they've been

25  very minimal since March of 2022.

1  Q      Do you know approximately how many such inquiries there

2  have been since March?

3  A      Well, I looked back to try to determine that and I

4  think there were four requests since January from Novan -- or

5  EPI Health to Aclaris to provide information related to in

6  vivo and in vitro and some clinical studies that were run

7  back in 2014/15.

8  Q      And those requests for information, was that

9  information that EPI Health needed, or was it for someone

10 else?

11 A      It was for Sato Pharmaceuticals for the agreement that

12 we signed in December of 2022 to out-license the rights in

13 Japan for Rhofade.

14 Q      And, notwithstanding those minimal inquiries from

15 Aclaris, does EPI owe Aclaris money today?

16 A      Yes we do.

17 Q      Do you know approximately how much?

18 A      We do owe them approximately $1.2 million, which is for

19 royalties and milestone payments only, but no services.

20 Q      And, to your knowledge, is Aclaris providing any

21 services to EPI under the APA or otherwise?

22 A      No they are not.  They had a transition services

23 agreement in October of 2019 and that was terminated a year

24 later, October of 2020, so two years prior to our

25 acquisition.

16

1  Q     And are you aware of any material obligations that

2  Aclaris owes to EPI under the APA?

3  A     I am not.

4          MR. ABBOTT:  That concludes my direct examination,

5  Your Honor.

6          THE COURT:  Thank you.  Any cross?

7          MR. APPLEBAUM:  Thank you, Your Honor.  Aaron

8  Applebaum, of DLA Piper, on behalf of Aclaris.

9                    CROSS EXAMINATION

10 BY MR. APPLEBAUM:

11 Q     Good morning, Ms. Stafford.

12 A     Good morning.

13 Q     Ms. Stafford, you testified on direct that EPI Health

14 acquired the rights to Rhofade in 2019 from Aclaris, is that

15 correct?

16 A     That is my understanding, yes.

17 Q     And are you aware of the prior history of the

18 acquisition of Rhofade and how it moved through the different

19 companies?

20 A     I know that it was Vicept to Allergan to Aclaris to EPI

21 to Novan.  I think that's the right order.

22 Q     And would you agree that the records reflect that there

23 was a 2009 assignment and license agreement from Aspect to

24 Vicept that relates to the Rhofade asset?

25          MR. ABBOTT:  Your Honor, I object.  If he's going

1  to ask her a question about a specific document, I think he

2  should show it to her.

3          THE COURT:  Well, he can ask if she's aware of it.

4  I'll overrule that now.

5          THE WITNESS:  I know there was agreement.  I can't

6  speak to the year.

7  BY MR. APPLEBAUM:

8  Q     And are you also aware of an agreement referred to as a

9  merger agreement between Vicept and Allergan dated in 2011?

10  A     Vaguely.

11  Q     And are you aware of a 2018 asset purchase agreement

12  from Allergan to Aclaris?

13  A     Yes.

14  Q     Now, you testified on direct that you are generally

15  familiar with the sale process and the process that has

16  evolved with the two buyers here, is that right?

17  A     Yes.

18  Q     And are you familiar with the asset purchase agreement

19  that is proposed to be entered into between the debtors and

20  Mayne with respect to the Rhofade asset?

21  A     Yes, um-hum.

22  Q     And are you aware that a copy of that proposed asset

23  purchase agreement was filed by the debtors on August 31st,

24  which is at Docket, I think, Number 241?

25  A     Yes.

18

1  Q     And are you familiar with the disclosure schedules to

2  that asset purchase agreement?

3  A     Yes, I did review them.

4  Q     And are you familiar with Schedule 3.6, which is the

5  schedule of material contract?

6  A     I remember that there was.  I wouldn't say that I knew

7  it was 3.6, but.

8  Q     And do you agree that all of the agreements that I just

9  outlined, the 2009 agreement, 2011 agreement, 2018 agreement,

10 and the 2019 agreement are all listed on that schedule as

11 material contracts?

12 A     I'd have to look at it to --

13              MR. ABBOTT:  Your Honor --

14              THE WITNESS:  -- tell you that.

15              MR. ABBOTT:  -- I would renew my objection to show

16 her a document if he wants to question her about it.

17              THE COURT:  Ma'am, I'm --

18              THE WITNESS:  I can't remember it by memory, but I

19 mean I remember -- whatever's been filed, I did look through

20 and I reviewed and approved.

21              MR. APPLEBAUM:  That's fine.  It's on the docket

22 already so I can move on, Your Honor.

23 BY MR. APPLEBAUM:

24 Q     Ms. Stafford, is it your understanding that the buyer,

25 Mayne, is acquiring and assuming all of those agreements in

1    the chain of title for the Rhofade asset, except for the

2    Aclaris asset purchase agreement?

3           MR. ABBOTT:  Objection, Your Honor.  That's a

4    level of detail I think is set forth in the document.  The

5    document is the best evidence of what the buyer is doing, and

6    if he wants to question her about that, he should show her

7    the document.

8           THE COURT:  I agree the document says what it

9    says.  So is -- are you asking for some other information

10   from this witness?

11          MR. APPLEBAUM:  Not with that question, no.

12          THE COURT:  Okay.

13          MR. APPLEBAUM:  Just seeing if she understood what

14   the agreement actually says, Your Honor.

15   BY MR. APPLEBAUM:

16   Q    Just a couple more questions, Ms. Stafford.  Are you

17   familiar with an individual named Brett Fair, who's a Vice

18   President at Novan?

19   A    He was.  He was only employed through June 7th.

20   Q    That's June 7th --

21   A    Of this year, of 2023.

22   Q    2023?

23   A    Um-hum.

24   Q    So he was employed on March 8th of 2023, is that right?

25   A    Yes.

1    Q      And are you aware that on March 8th, he contacted a

2    James Loerop, of Aclaris, requesting multiple study reports

3    from a Module 4 of the Rhofade NDA?

4    A      Well, as I mentioned, and he was one of the four emails

5    that I mentioned that went back and forth and did ask for

6    some information to give to Sato, yes.

7                    MR. APPLEBAUM:  No further questions, Your Honor.

8                    THE COURT:  Thank you.

9                    MR. APPLEBAUM:  Thank you.

10                   THE COURT:  Anyone else on cross?

11          (No verbal response)

12                   THE COURT:  Redirect?

13                   MR. ABBOTT:  No redirect, Your Honor.  Thank you.

14                   THE COURT:  Thank you, Ms. Stafford.  You may step

15   down.

16                   THE WITNESS:  Thank you.

17                   THE COURT:  Does the debtor have any other

18   witnesses or evidence to put into the record?

19                   MR. ABBOTT:  Just the Wein Declaration that we

20   discussed already.  So no further presentation on evidence by

21   the debtors at this point.

22                   THE COURT:  Thank you.  Does anybody else have any

23   evidence to put into the record?

24          (No verbal response)

25                   THE COURT:  Okay.  I hear no one, so the record --

1    the evidentiary record is closed.

2            MR. ABBOTT:  Thank you, Your Honor.  Your Honor,

3    with that, we believe that the debtors have established the

4    evidence they need for the Court to approve the sales, as

5    requested.

6            The only remaining objection of which I'm aware is

7    that of Aclaris and, obviously, they'll present their

8    objection.  But, as we understand it, Your Honor, they seem

9    to be selling -- or saying that we cannot sell the Rhofade

10   assets to Mayne without assuming the APA by which EPI

11   obtained that business.

12           Your Honor, if they are right, and we don't think

13   they are, then Mayne will not close the transaction and the

14   value that we and the Committee fought hard to obtain for

15   creditors will be lost.  Rhofade won't sell.  Patients won't

16   continue to have access to it, and not only will Aclaris not

17   get the claimed additional purchase price that they are owed

18   under the APA, but they won't get any meaningful distribution

19   in these cases on account of their claim.

20           So it's sort of a tails, you win; heads, I lose,

21   proposition for Aclaris.  So we don't really understand it.

22   We think the objection is unsupported by law or fact and

23   we'll reserve further comments until after they argue their

24   objection, Your Honor.

25           It does lead, as I mentioned earlier, to a little

 1  bit of administrivia.  We've got to deal with -- Aclaris

 2  filed a motion for leave to file and serve a sur-reply, to

 3  which we objected or alternatively sought permission to file

 4  a response.  My hunch is the Court has probably read those

 5  papers and, while the typical order of presentation may have

 6  been a little backwards, I think Your Honor, candidly, that

 7  the sur-reply and our response do frame the issues a little

 8  more fully for the Court.

 9        But, just for the record, I think we should

10  probably get the Court's ruling on those and then let Aclaris

11  argue its objection.

12        THE COURT:  I'll hear the objection and the

13  response.

14        MR. ABBOTT:  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. ABBOTT:  I'll cede the podium to Mr.

17  Applebaum.

18        MR. APPLEBAUM:  Thank you, Your Honor.  Again,

19  Aaron Applebaum, DLA Piper, on behalf of Aclaris.

20        Your Honor, the Aclaris objection is a little more

21  nuanced than the summary that Mr. Abbott just provided.

22        Yes, in part, we are arguing that the Aclaris

23  asset purchase agreement is an executory contract and that it

24  needs to be assumed and assigned in order for those rights

25  and the rights under it to pass to the buyer.  That agreement

1  was submitted by the debtors as an attachment to one of their

2  exhibits -- to one of their replies, but I don't think it was

3  actually moved into evidence today.

4          But more importantly, Your Honor, regardless of

5  whether the agreement is executory and must be assumed and

6  assigned, the bigger argument, the more important argument,

7  is that when a buyer purchases an asset such as Rhofade,

8  which is subject to multiple different royalty obligations

9  under a variety of agreements that exist in the chain of

10  title, it cannot pick and choose which royalty obligations

11  it's going to honor going forward.  It cannot pick and choose

12  which documents in the chain of title it's going to acquire.

13  They are all material.  They'll all part of an integrated set

14  of documents that create the chain of title.  And what is

15  happening is that they are trying to use a recent decision

16  from Judge Dorsey in the Mallinckrodt case to suggest that

17  future royalties that will only arise as a result of the

18  buyer's conduct in manufacturing and selling Rhofade should

19  all be lumped together as -- under this amorphous concept of

20  a pre-petition claim which will stay with the bankruptcy

21  estate, essentially allowing them -- allowing the debtors, as

22  part of a 363 sale, to cleanse an asset of a royalty

23  obligation that necessarily flows with it as part of the

24  chain of title.

25          THE COURT:  Okay.  So I saw in your papers this

1   chain of title concept but you don't cite to me anything for

2   this idea of whatever this concept of chain of title is.

3           MR. APPLEBAUM:  We don't, Your Honor, because,

4   frankly, we've never found a case where a debtor in a 363

5   sale has attempted to sell a pharmaceutical product that is

6   subject to these royalty obligations and to leave the royalty

7   obligations with the estate, even with respect to royalties

8   that go forward.

9           THE COURT:  Well, maybe not in the pharma context,

10  but explain this chain of title thing to me again because I'm

11  not understanding why this is unique.  A debtor bought an

12  asset.  It bought a business.  It bought the assets.  It got

13  title under the documents.  It was a sale, just like any

14  other business.  The debtor owns it.  So what is the chain of

15  title concept that follows -- that's supposed to follow that?

16          MR. APPLEBAUM:  The chain of title concept and why

17  it's unique here is that each subsequent entity in the chain

18  is agreeing to finance the deal, their acquisition, through a

19  royalty obligat8ion.

20          THE COURT:  Right.

21          MR. APPLEBAUM:  And that's a royalty obligation

22  that goes forward.  And then when each next person in the

23  next entity in the chain acquires it, they are assuming that

24  royalty obligation from the prior arrangement.

25          So, for example --

1          THE COURT:  Well, they may have agreed to do that.

2          MR. APPLEBAUM:  They --

3          THE COURT:  But as part of the purchase price.

4          MR. APPLEBAUM:  They did, as part of the purchase

5  price.  But the seller -- so when Aspect sold to Vicept and

6  then when Vicept sold to Allergan, each buyer assumed that

7  obligation, but the seller would remain potentially

8  secondarily liable for future sales if that agreement was not

9  assumed.

10          So as part of this business and in this industry,

11  parties who are contracting rely on the fact that the

12  ultimate seller at any given point in time, will remain

13  liable for the royalties.  Otherwise, someone who

14  historically owned this asset and owned a royalty backwards

15  in the chain of title could suddenly become liable for the

16  buyer's conduct going forward.  So Vicept sold to Allergan in

17  2011 and Allergan agreed to pay a royalty to Vicept as part

18  of that.

19          If the debtor doesn't -- if -- when the debtor

20  sells and Mayne starts manufacturing and selling Rhofade in

21  2023, 2024, 2025, that creates the potential for a royalty

22  obligation that would flow back to Vicept and if Mayne

23  doesn't pay that, there's a risk that Allergan could have to

24  owe that to Vicept, even though Allergan has nothing to do

25  with the current sales and is no longer directly part of the

1  chain of title.

2          THE COURT:  Well, is that the contract it made;

3  that it could face that possibility?

4          MR. APPLEBAUM:  It is the contract it made but it

5  did so based on the expectati8on, based on how this has

6  happened for years in this industry, that a subsequent buyer

7  cannot divest the asset from the royalty.

8          THE COURT:  Where is the non-bankruptcy case law

9  that says that?  There must be then some non-bankruptcy case

10  law that says that that nobody has cited to me.

11          MR. APPLEBAUM:  We -- Your Honor, we're not aware

12  of non-bankruptcy case law that says that either because,

13  again, this is the way this has just always transpired and

14  the industry expects it and what the debtors and Mayne are

15  seeking to do here has the risk of severely disrupting the

16  way that royalty financing and royalty acquisitions are done

17  in the entire pharmaceutical industry.

18          THE COURT:  Well, I have nothing in front of me

19  that tells me how the royalty sales are done in the entire

20  industry, the custom, the -- I have nothing of that in front

21  of me by way of evidence, nor do I have any law that tells me

22  this chain of title concept -- there are plenty of cases in

23  bankruptcy where the business is sold and it's a business --

24  or assets are sold through multiple entities.  I have several

25  in front of me right now, some that trace back to the

1  beginning of the 1900s and have gone through probably six or

2  seven different owners and there are consequences to that.

3  But I don't know how that means the asset can't be sold free

4  and clear of previous asset purchase agreements and whatever

5  obligations people have and you haven't cited me to anything

6  that suggests that.  I do think non-bankruptcy law is

7  relevant to this question, but you haven't given me any.

8              MR. APPLEBAUM:  Your Honor, I would be happy to go

9  back and subsequently brief that.

10             THE COURT:  We're here today.

11             MR. APPLEBAUM:  I understand that.

12             THE COURT:  We're here today and, actually, if I'm

13 remembering correctly, your objection kind of morphed and

14 it's evolved, may be a better word to use, over the course of

15 the objections.

16             If this was the situation, why didn't you come in

17 from the beginning and tell me so that we could address this

18 issue?

19             MR. APPLEBAUM:  Well, Your Honor, and I'm very

20 happy to address that because that fits into this -- these

21 motions for replies and sur-replies and why --

22             THE COURT:  I've granted them.  I'm going to hear

23 everything because cases move quickly.

24             MR. APPLEBAUM:  Yes, Your Honor.

25             THE COURT:  But --

1          MR. APPLEBAUM:  But the reason is -- the reason we

2     weren't here on August 15 or whenever is because what was

3     before the Court in the original sale motion did not say

4     anything about a sale free and clear of royalties.  It did

5     not say anything about the obligations under the Aclaris APA

6     being an excluded liability.

7          This was a new concept that arose on August 31st

8     when the debtors filed their notice of winning bid with the

9     Mayne APA attached and the Mayne APA does two things that are

10    very different than what the Ligand stalking horse APA did.

11         The first is it specifically identifies the

12    Aclaris APA and obligation -- post-petition obligations that

13    run from it as an excluded liability and it also contains new

14    language in paragraph (t), I believe, of the proposed sale

15    order, which says that, for avoidance of doubt, a sale free

16    and clear includes any future royalties that would arise.

17         THE COURT:  Um-hum.

18         MR. APPLEBAUM:  This is different from what we

19    normally assume a free and clear order in bankruptcy to do,

20    which is to sell free and clear of existing liabilities that

21    exist as of the date of either the petition or the date of

22    closing but not future liabilities that will only arise as

23    the result of conduct either from a reorganized debtor or

24    from a buyer under a 363 sale.

25         THE COURT:  Well, if it's a pre-petition

1  agreement, which it is --

2          MR. APPLEBAUM:  Yes.

3          THE COURT:  -- then why aren't the -- and the

4  liability is part of the purchase price, then it's part of

5  the purchase price.

6          MR. APPLEBAUM:  It -- Your Honor, every obligation

7  under a pre-petition contract is not necessarily a pre-

8  petition obligation, and I don't want to reargue the

9  Mallinckrodt decision, though I am more familiar with it than

10 I ever want to be.

11         THE COURT:  But it's not just Mallinckrodt.  I

12 mean this goes way back.  I mean I remember Loewen, quite

13 frankly, where this issue came up, which was a chain of

14 funeral homes where the debtor purchased funeral homes

15 throughout the whole country and that was a big issue in the

16 case as to whether the purchase price -- whether they were

17 executory contracts, whether it mattered if they were

18 rejected, or whether they were just pre-petition non-

19 executory contracts and Judge Walsh held that it didn't

20 matter because it was a pre-petition obligation and anything

21 with respect to those businesses and the purchase price was a

22 pre-petition obligation.

23         MR. APPLEBAUM:  And I --

24         THE COURT:  The debtor could have kept a security

25 interest -- I mean Aclaris could've kept a security interest

1  in the royalties and been in a different position.

2         This was -- as I'm reading the contract, this is

3  just the purchase price obligation.

4         MR. APPLEBAUM:  Your Honor, it is a purchase price

5  obligation but when that obligation arises is tied to

6  conduct, the conduct of selling and manufacturing the Rhofade

7  asset and there is plenty of case law, including the

8  Weinstein decision from the Third Circuit which suggests that

9  when a -- that you bifurcate those obligations and those

10  royalty obligations that arose prior to the sale are

11  obligations of the estate if the contract is non-executory

12  and the obligations that will arise in the future from the

13  buyer's conduct are the buyer's obligation.

14         THE COURT:  Weinstein didn't decide that issue.

15         MR. APPLEBAUM:  Yeah.

16         THE COURT:  I discussed Weinstein in Boy Scouts

17  and Weinstein didn't discuss that -- didn't have to reach

18  that because the buyer there agreed to take the post-petition

19  obligations.  So Weinstein doesn't tell us that.  I think

20  what Weinstein does tell us is sometimes non-bankruptcy law

21  matters and, again, I didn't get any non-bankruptcy law in

22  this.

23         And I think Judge Ambrose said that again in

24  whichever case somebody cited to me.  He -- I was glad to

25  read that because it meant I read his case correctly and the

1    Third Circuit case correctly.

2           But, yeah, Weinstein doesn't help because there

3    they purchaser, for whatever reason, it decided it was in its

4    interest to take on that obligation voluntarily.

5           But what about just the regular -- I mean we could

6    even go back to Friendsville, which has been overruled but it

7    even had a paragraph -- a footnote that said if you have an

8    obligation in a contract, that obligation arises when you

9    sign the contract.

10          MR. APPLEBAUM:  Yes.

11          THE COURT:  So -- and even in that disfavored

12   case, nobody said they didn't get that part of it right.

13          MR. APPLEBAUM:  Well, Your Honor, I think they --

14   I think that the overruling of Friendsville, in Grossman's,

15   and then in Owens Corning, does affect that result because it

16   says that you look to the conduct of the debtor in deciding

17   when the claim arises and when they put a product into the

18   stream of -- you know, in the tort context, it's obviously a

19   little bit different than in a purely contractual one, but

20   you're still looking at the conduct and it -- it simply --

21   there's no basis in Section 363 or Section 365 to say that,

22   just because the contract was signed pre-petition that every

23   obligation that arises out of that contract, regardless of

24   what conduct is required to trigger the obligation, also

25   should necessarily relate back and be a pre-petition claim.

1          THE COURT:  Okay.  So is Aclaris taking the

2   position that the contract is executory or non-executory?

3          MR. APPLEBAUM:  Our position is that the contract

4   is executory.

5          THE COURT:  And what obligations does Aclaris

6   have?

7          MR. APPLEBAUM:  Under the contract, Aclaris is

8   continuing to provide ongoing cooperation and assistance with

9   respect to FDA and NDA approvals.  It is providing -- it is

10  required --

11         THE COURT:  And what -- because I did pull out the

12  -- wait a second.  Okay.  Paragraph 7 of the agreement,

13  right, is what --

14         MR. APPLEBAUM:  I believe that's right, Your

15  Honor.  I'm --

16         THE COURT:  -- is what you referred -- your client

17  referred to.

18         MR. APPLEBAUM:  Yes.  With respect to ongoing

19  cooperation, I believe that is paragraph 7 and, as mentioned

20  in the testimony of Ms. Stafford earlier, those requests for

21  cooperation are ongoing and they're -- they may not be --

22         THE COURT:  I don't know if they're under the

23  contract or they just asked for it and your client gave it to

24  them.

25         MR. APPLEBAUM:  Well, certainly Aclaris' view is

1  that they're cooperating because they were contractually

2  obligated to do so under the APA.

3          THE COURT:  Where is my testimony on that?

4          MR. APPLEBAUM:  That's --

5          THE COURT:  Because I think many of these

6  obligations appear to have expired.

7          MR. APPLEBAUM:  Some do, Your Honor.  There are

8  ongoing obligations to address non -- allegations of non-

9  compliance raised by the Government.  There's what's --

10          THE COURT:  Okay.  Which one is that?  I want to

11  be very specific in this contract about which obligations you

12  think are ongoing because I'm thinking of the Exide case as

13  well, which was the sale of a business with certain ongoing

14  supposedly remaining obligations which were found to be non-

15  material.

16          MR. APPLEBAUM:  Your Honor, in the Aclaris APA,

17  Section 7.13.2, is the continuing -- the obligation to

18  provide post-closing cooperation in addressing any

19  allegations of non-compliance by a governmental authority.

20          THE COURT:  7.13.2.  But isn't -- I don't know.

21  Am I reading this correctly, that -- the first sentences are

22  about buyer.  Seller shall be responsible for all costs and

23  expenses, including the reasonable costs and expenses of

24  buyer or its affiliates with respect to any investigation and

25  disposition of the Rhofade product, the seller sold product,

1  excluding -- the parties shall cooperate and work together.
2  Is that what you're looking at?

3              MR. APPLEBAUM:  Yes, Your Honor.

4              THE COURT:  In good faith in addressing all such
5  non-compliance allegations.  I don't know.  Was that a non-
6  compliance allegation or was that -- what information do I
7  have that there've been non-compliance issues?

8              MR. APPLEBAUM:  No, Your Honor.  There's no
9  evidence that there have been.  The evidence is that the --
10 the point is only that this is an ongoing obligation that is
11 still live and is still an obligation that Aclaris has to
12 comply with if it comes up.  I'm not --

13             THE COURT:  Forever?

14             MR. APPLEBAUM:  That's our understanding.  It's an
15 existing agreement, yes.

16             THE COURT:  Forever?

17             MR. APPLEBAUM:  I'm not aware of any time
18 limitation on that particular obligation, Your Honor.

19             Your Honor, one that does have a time limitation
20 is in Section 7.16, which is a seven-year prohibition that
21 limits Aclaris' right to research, develop, manufacture,
22 commercialize, sell, or otherwise exploit competing products.

23             And again, this agreement was executed in 2019, so
24 that is very much still a live and restrictive provision that
25 limits what Aclaris can do with its commercial activities.

1          THE COURT:  Well, if your position is this is

2   executory and it's rejected, well, then the debtor can reject

3   the contract and how does that help you?

4          MR. APPLEBAUM:  Well, Your Honor, our position is

5   that, under established Third Circuit precedent, including

6   the Sharon Steel case, the debtor has to either assume and

7   assign the entirety of the contract or reject the entirety of

8   the contract and in this case, its right to manufacture and

9   sell Rhofade is part of the bundle of rights that it has

10  through this agreement and so rejection would prohibit it

11  from doing so and cannot --

12         THE COURT:  No.  Rejection doesn't undo things.

13  Rejection doesn't undo the sale of a business.  It -- future

14  obligations are rejected.  It doesn't undo the whole sale of

15  a business.

16         I don't think there's any case law that says it

17  undoes the sale of a business.

18         MR. APPLEBAUM:  Certainly there are not many cases

19  dealing with asset purchase agreements as executory

20  contracts, let alone the effect of rejection on it.

21         THE COURT:  Exide did.  Exide -- the Third

22  Circuit's case in Exide did exactly that.  It was a really

23  interesting case in which the debtor sold the right to a

24  competitor to use its name, right, and then like ten years

25  later, they wanted to use their -- in a certain sphere, and

1   ten years later, the debtor wanted to enter that sphere

2   itself, tire making, I think, and it wanted the name back.

3   So, yeah, there are plenty of -- and Exide was the case that

4   immediately came to mind when I was reading this is it

5   doesn't undo a sale.

6           There the Court held that, as a I recall, that the

7   obligations remaining, indemnification, other obligations,

8   weren't sort of central to the sale itself and they weren't

9   material or executory.  They didn't make the contract

10  executory.

11          I'm struggling on the evidence that I got to find

12  the remaining obligations.  Yeah, Exide.  The other two

13  obligations that Exide argues are substantial.  The

14  indemnification obligation and the further assurances

15  obligations do not outweigh the factors supporting

16  substantial performance.  So they also had a substantial

17  performance argument.

18          MR. APPLEBAUM:  Again, Your Honor, our view is

19  that the only real impact of your decision of whether or not

20  the contract is executory is whether the pre-petition default

21  has to be cured in order for the contract to be assigned,

22  assuming, as we've already said, that the contract has to be

23  assigned in order to preserve the chain of title.

24          THE COURT:  Yeah.  It's that -- go back to that

25  argument because, if that's the argument, I don't get the

1  chain of title argument.  That seems to be your real argument

2  that somehow Aclaris contract has to be taken because it's in

3  the chain of title and I know of nothing that suggests that's

4  the case and I guess Aclaris is unhappy because other

5  contracts in the chain of title are being taken, but Aclaris'

6  contract isn't?

7        MR. APPLEBAUM:  Every other one is.  But it's not

8  only that they're being taken.  It's not that we're upset

9  that we're being left behind, Your Honor.  It's that they've

10 identified this, our contract, as well as all of the others,

11 as material contracts and in their APA, in Section 3.6(b),

12 they acknowledge that material contracts are those that are

13 necessary for the debtor's ownership and operation of the

14 business.

15       So they've listed us as a material contract.  They

16 say that material contracts are needed for ownership and

17 operation but then they've added in this conflicting language

18 in Section 2.4, which says, all future liabilities are an

19 excluded liability.  So even though the contract is material,

20 we're just not going to pay the royalty and they've also

21 added in language in the sale order to that effect, saying

22 for -- in paragraph (t), for avoidance of doubt, free and

23 clear means we don't have to pay royalties.

24       So, Your Honor, we think that the debtors and

25 Mayne agree that they need this contract by listing it as a

1   material contract, and by the language in 3.6(b), they're

2   merely trying to use provisions in the Bankruptcy Code to

3   immunize the buyer from the results of its post-closing

4   conduct.

5           THE COURT:  Oh?

6           MR. APPLEBAUM:  Which is not what 363(f) is

7   supposed to do.  It's not an existing liability.  If the

8   contract is non-executory, then we understand certainly

9   Weinstein does say that the pre-petition cure amount, pre-

10  petition default, is a liability that stays with the estate.

11          But if they're taking the contract, and it seems

12  that they are by listing it as a material contract and it

13  seems that they need to by the language in 3.6(b), and it

14  seems that they need to by the fact that every other contract

15  in the chain of title is being taken on, then we do fall

16  within Weinstein and the same choice that the buyer made

17  there, which was we agree we need these contracts; we're

18  taking them, and it wasn't even disputed in Weinstein.  It

19  was just taken for granted by both the Third Circuit and the

20  parties that the buyer would pay the go-forward obligations.

21          THE COURT:  No, it wasn't taken for granted.  It

22  was agreed to by the buyer.  That's different.  That's a big

23  difference.  It wasn't -- neither of -- well, the Third

24  Circuit doesn't comment on that.  It was just agreed to by

25  the buyer for whatever reason and there could be reasons that

1   it wanted to or was willing to take on that agreement.

2          Okay.  Well, I am interested in hearing from the

3   debtor about its listing the agreement as a material contract

4   and what that means and what that was supposed to mean and

5   why, if it's a material contract, how is it being taken, in

6   what context is it being taken?

7          Thank you.

8          MR. APPLEBAUM:  Thank you, Your Honor.

9          MR. ABBOTT:  Your Honor, Derek Abbott again for

10  the debtors.

11         There were a lot of words said, Your Honor.  I'm

12  not sure of the meaning of most of them.  I will tell you now

13  the debtors do not believe that Mayne is taking the Aclaris

14  APA.  It is listed, Your Honor, on the schedule in the APA as

15  a material contract, which is just a disclosure schedule that

16  requires the debtors to identify any contracts to which a

17  seller is a party or that they may be bound that relates to

18  the acquisition or disposition of any purchased assets.

19         This shows that we own the license to manufacture

20  Rhofade.

21         THE COURT:  Which schedule is it?  3.6?

22         MR. ABBOTT:  3.6(a), Your Honor, is the material

23  contract schedule.  The schedule that matters, and I think

24  the schedule that Aclaris would like their agreement to be

25  on, is Schedule 2.6(a), which is the assumed contract

1   schedule.

2           THE COURT:  So I'm assuming that Schedule 3.6(a)

3   refers back to Section 3.6 of the agreement?

4           MR. ABBOTT:  It does, Your Honor, on page 25 of

5   the Mayne asset purchase agreement.

6           THE COURT:  Okay.  So that's the material

7   contracts and then the assumed contracts --

8           MR. ABBOTT:  And that's just a representation.

9   It's in the representation and warranties of seller section,

10  Your Honor, and it's just the disclosure schedule.

11          If you go back to Section 2.6 that discusses

12  assumption and assignment of contracts, that's a separate

13  schedule and that's where the assumed contracts are listed.

14          So the fact that we identify a contract as part of

15  a rep and warranty, which is how we acquired certain assets

16  that are being sold, doesn't mean we're taking that -- or

17  selling that contract.  It just recites the history as a

18  matter of diligence for the protection of a buyer.  And,

19  obviously, I'll let Mr. Hogewood speak, as appropriate, who

20  represents Mayne, Your Honor.

21          But, in short, we don't think we're selling that

22  contract.  We don't think Mayne's buying that contract. It's

23  not being assumed.  We are -- to your point, Your Honor, we

24  bought a license under that contract.  We are selling the

25  rights under that license separately.  But it's no different

1   than us having bought raw material inventory that was to be

2   paid over time that we still owed money on as of the petition

3   date and are selling those assets free and clear like happens

4   in virtually every bankruptcy case and the seller who has a

5   claim for purchase price simply has a general unsecured

6   claim.

7           THE COURT:  Like an earn-out.

8           MR. ABBOTT:  Right.  If you look at the Aclaris

9   APA, Your Honor, it states very clearly that the monies that

10  they think that they're owed may be, depending on what --

11  under their contract, what EPI did to market and

12  commercialize successfully their product, that's all listed

13  as additional purchase price.  It's not even called a

14  royalty, Your Honor.

15          It's interesting.  We started this case talking

16  about royalties being -- necessarily being assumed, being

17  unorthodox, and out of the norm.  What Aclaris is arguing

18  today is that no, that's absolutely the norm and it has to

19  happen.  It's just not the case.  There is no case law that

20  they've cited in or outside bankruptcy to that end, Your

21  Honor.

22          So I want to answer Your Honor's questions, but --

23  and we'll certainly concede that Mr. Applebaum has been

24  creative in attempting to meet his client's goals, but we

25  just don't think this objection has any basis in law or fact,

1    Your Honor, and would ask --

2              THE COURT:  Okay.

3              MR. ABBOTT:  -- the Court to overrule it.

4              THE COURT:  Let me ask this question.  So 2.6 is

5    assumption and assignments of contracts and there's -- I

6    don't see that schedule attached to the APA, but I assume

7    it's somewhere, at least not numbered.

8              MR. ABBOTT:  Your Honor, it's -- if you're looking

9    at the -- I'm looking at Docket Item 242-1.

10             THE COURT:  Yes.

11             MR. ABBOTT:  Page 68 of 174 at the top is 2.6(a),

12   the assumed contract list.

13             THE COURT:  Oh, okay.  2.6.  Okay.  So I see a

14   bunch of agreements on this list that seem to -- that at

15   least have Aclaris -- okay, Aclaris to Allergan.  So it does

16   have -- some contracts that are being assumed are in what Mr.

17   Applebaum is referring as to the chain of title.

18             MR. ABBOTT:  Some --

19             THE COURT:  Is that right?

20             MR. ABBOTT:  Some of these contracts that are

21   being assumed do relate to the assets that are being sold;

22   yes, Your Honor.

23             But as far as chain of title goes, Your Honor, it

24   -- let me find a different page.  Your Honor, I can't put my

25   hands right on the page.  It'll take me a second to find it.

1  But attached to the Aclaris APA at issue is a bill of sale,

2  Your Honor, that sets forth very clearly that they've sold

3  those assets free and clear and that we acquired them.  It's

4  page -- I'm sorry.  It's page 218 of 295, Your Honor, in

5  Docket Item Number 272-2, and I think that document itself is

6  all we need to establish chain of title.  But chain of title

7  is not what's being purchased.  The assets are what's being

8  purchased.

9           We can use that chain of title and that document

10  to later prove to someone that we've got the rights under the

11  license that was purchased by the APA, but that's all we need

12  to do, Your Honor, and that's all that Mayne will need to do.

13           THE COURT:  Okay.  So what is the debtor doing

14  with this contract?  It's not assuming and assigning it.

15           MR. ABBOTT:  Correct.

16           THE COURT:  That's clear.  Is it selling it under

17  363 or is it just leaving it behind?

18           MR. ABBOTT:  It's -- as I understand it, Your

19  Honor, and I'm happy for Mr. Hogewood to say it, but we

20  understand we're leaving it behind, subject to later

21  assumption or rejection, you know, on or before confirmation,

22  as required by the Code.

23           THE COURT:  So does the debtor think it's

24  executory?

25           MR. ABBOTT:  We do not think it's executory, Your

1  Honor.  We think it's non-executory.  We think that the only

2  remaining obligations are incidental, not material, in

3  accordance with Exide that we cited in our response, Your

4  Honor, that Your Honor mentioned earlier.

5       THE COURT:  Okay.  But under this agreement, under

6  the Mayne agreement, the Aclaris contract is not being

7  assumed and assigned and it's not being sold?

8       MR. ABBOTT:  That is correct, Your Honor.

9       THE COURT:  So if that's the case, I assume Mr.

10 Applebaum's issue is what's with the order, what does the

11 order say then with -- that could impact his client in the

12 future.

13      MR. ABBOTT:  I think what the order says is that

14 it's included and it's specifically set forth in the APA as

15 an excluded asset.  I don't know how that harms his client,

16 other than it wasn't assumed and, obviously, everybody would

17 rather have it assumed or sold so that they could take

18 advantage of rights flowing post-closing, but that's not

19 what's happening here.  The buyer didn't want it.

20      THE COURT:  I'm just trying to make sure I

21 understand the state of play since I got this very late as

22 well.

23      MR. ABBOTT:  Understood, Your Honor.

24      THE COURT:  And haven't had the time it would've

25 been nice to have to consider this.

1          I think if we were in a license agreement

2     scenario, we'd be in a different scenario.

3          MR. ABBOTT:  We would be, Your Honor.  What -- and

4     interestingly, Aclaris had the ability when they structured

5     this deal with EPI to do it as a license agreement.  They

6     didn't.  Whether it was because they didn't think of it or

7     that EPI wouldn't buy it, I don't know.  But it's not a

8     license agreement.  They sold us the rights under an existing

9     license agreement that we now own and are selling to Mayne.

10          THE COURT:  So the only other context that I can

11     think of where royalty agreements might flow with the sale

12     are in the oil and gas cases where we have real estate that

13     the owner has been granted a royalty relative to operations

14     on their land.  But I think that's because it runs with the

15     land.  I think that's because of --

16          MR. ABBOTT:  That's exactly right, Your Honor.

17          THE COURT:  -- non-bankruptcy law that makes the

18     royalty run with the land and so I don't think they can be

19     shed.

20          MR. ABBOTT:  That is consistent with my

21     understanding, Your Honor, and I think we even cited a case

22     that suggested that these do not "run with the land" so to

23     speak.

24          But if they wanted these royalty rights to, they

25     could have by taking a security interest in that license

1   agreement or in the patent or in the royalties.

2          Now, even those, Your Honor, may not stand up

3   necessarily to bankruptcy law --

4          THE COURT:  Um-hum.

5          MR. ABBOTT:  -- unfortunately, but we're not in

6   that situation and I'm happy to answer the Court's further

7   questions, but I just think we're -- novel argument, Your

8   Honor, but without merit.

9          THE COURT:  Okay.  Let me hear from the Committee

10  or the buyer and then I'll give Mr. Applebaum another cleanup

11  chance.

12         MR. LATHROP:  Good morning, Your Honor.  James

13  Lathrop, of Goodwin Procter, for the Official Committee of

14  Unsecured Creditors.

15         Your Honor, I know we've heard a lot of legal

16  issues today, but I mean the Committee supports the sale.  It

17  was the result of a hard fought process that resulted in an

18  increase economics for general unsecured creditors.  We

19  worked hard with the debtors for a creative value and we

20  believe that the Mayne bid for the Rhofade assets and the

21  incremental value described in the Wein Declaration shows

22  that -- shows recoveries for unsecured creditors.

23         So we, therefore, believe that this is -- that a

24  result approving the sale order in favor of the debtors is

25  what the Committee supports.  Not approving the sale today

47

1  will have destructive value for general unsecured creditors

2  and, accordingly, the Committee agrees the Court should

3  approve the sale orders as entered -- as on the docket today.

4          THE COURT:  Thank you.

5          MR. HOGEWOOD:  Your Honor, did you want to hear

6  from me?

7          THE COURT:  Yes, always.

8          MR. HOGEWOOD:  Thank you very much.  Lee Hogewood,

9  with K&L Gates, North Carolina Bar.  Thank you for hearing

10 this.

11         I don't have a lot to add to what Mr. Abbott has

12 already articulated very well.  We looked at this issue hard

13 from the beginning and, as you always do in these situations,

14 you look at the contracts, you determine if there is an

15 argument that they are not executory and, therefore, cannot

16 be assumed, including contracts that you might want to have,

17 and you consider whether, if they are executory, whether you

18 need any of the obligations that the counterparty might

19 perform and we looked at those things with respect to the

20 contracts that we did assume and concluded that there were --

21 there was performance due and that we needed it and, as a

22 consequence, we have assumed the -- we have included in the

23 APA, the assumption of those contracts.

24         The Aclaris agreement, APA agreement, was not such

25 a contract and, as a consequence, our client concluded that

1    it was unnecessary in order for them to continue to operate

2    the business after closing and so we excluded it and we made

3    very explicit in the proposed order that it was to be

4    excluded so that there was not any question about that.

5              This was a matter of intense focus by our client

6    throughout the process and, indeed, as Mr. Abbott said, the

7    burden of this contract, if it were -- if we were required to

8    assume it, would have not -- we would have been unable to

9    make any bid, much less the bid that we made for the asset,

10   and it is a closing condition that we do not have to assume

11   and so we would have to exit field if the Court were to

12   conclude it is a requirement.

13             This notion of chain of title, we've looked hard

14   for case law on that subject in the context of these pharma

15   products and it's not there.  There is no case law that

16   supports that particular concept.  The way to protect this

17   form of financing is to couple the royalty with a license or

18   to put a security agreement together.

19             And, as you will recall from the Phasebio case,

20   SFJ did all of those things, and more, in its agreement that

21   was challenged in that case by the debtor.  Ultimately, those

22   two parties reached a resolution, as you'll -- as you recall,

23   but this is very different.  This is a contract that seems to

24   only have obligations on the part of the debtor going

25   forward, which is to pay money.

1          That is a pre -- that is a classic pre-petition

2  claim, whether that claim exists before the case is filed or

3  it may be some obligation that arises after.  It is a claim

4  that can be valued as of the petition date.  Some evidence

5  can be presented as to what those royalties might have been

6  and the Court can value the claim as an unsecured claim and

7  Aclaris will participate in some distribution as a

8  consequence of the sale and the sale to Ligand.

9          THE COURT:  What about Mr. Applebaum's argument

10  that the conduct that's giving rise to the claim really will

11  occur here not only post-bankruptcy, but post-closing, and so

12  that the royalties should become due at that point in time?

13          MR. HOGEWOOD:  I think you turn to the contract

14  and you see, as Mr. Abbott pointed out, that that is part of

15  the purchase price in a contract that was signed in 2019

16  between Aclaris and EPI.

17          Again, Aclaris could've protected the right by

18  taking a security interest in those future payments and it --

19  and then we would be valuing the claim right now to determine

20  how much was going to be treated as a secured claim to be

21  paid from the proceeds of the sale and if the price was high

22  enough to permit a sale over the lien.

23          But it's no different from future payments under a

24  set of loan documents.

25          MR. ABBOTT:  Your Honor, might I respond to that

1  question as well, briefly?

2           THE COURT:  I'll give you -- in a minute.

3           MR. ABBOTT:  Sure.

4           THE COURT:  I'll give you that opportunity.

5           Okay.  So your client is not taking this Aclaris

6  contract in any way, shape, or form, or expecting any

7  performance from Aclaris in the future?

8           MR. HOGEWOOD:  Absolutely not.  We don't -- we do

9  not require anything from them, including cooperation as was

10 mentioned, nor could we -- there's nothing for us to enforce

11 because we have not had the contract assumed and assigned to

12 us and so, for example, if they completed, we can't stop it.

13          THE COURT:  Okay.  Thank you.

14          MR. HOGEWOOD:  Thank you, Your Honor.

15          THE COURT:  Thank you.  Mr. Abbott, you wanted to

16 add something?

17          MR. ABBOTT:  Your Honor, I was just going to say

18 the obligation to make the additional purchase price payments

19 occur when sales milestones are reached.  Strike that.  The

20 obligation to pay the -- to pay those amounts was entered

21 into pre-petition when the contract was signed.

22          The activity that Mr. Applebaum talks about is

23 only activity that fixes what those payments might otherwise

24 be.  The obligation to pay occurred when they signed the

25 agreement.  It's simply that you need that activity if it

1 ever occurs to measure what that -- what the actual

2 obligation might amount to, and I think that's consistent

3 with the case law, Your Honor.

4     THE COURT:  Okay.  Thank you.  Mr. Applebaum, I'll

5 give you an opportunity if you wish.

6     MR. APPLEBAUM:  Thank you, Your Honor.  Again,

7 Aaron Applebaum, DLA Piper, on behalf of Aclaris.  Your

8 Honor, I'll be brief.

9     First, just to quickly respond to what Mr. Abbott

10 just said, I certainly disagree that a royalty payment and

11 the timing of it is merely one of measurement.  Certainly

12 believe that the claim only arises if and when the conduct

13 occurs.  If there's no conduct, if there are no future sales,

14 then there are no -- there's no payment obligation.  So if

15 the conduct does not occur, then there is no payment

16 obligation.

17     There are multiple cases dealing with mortgage

18 agreements that are non-executory, that don't get taken by a

19 buyer or taken by a reorganized debtor because they're non-

20 executory and then when the debtor takes some action, it

21 triggers liability, like suing the lender and then losing,

22 triggers an attorneys' fee provision.

23     That claim, even though the indemnification or the

24 contribution obligation was in the contract, and therefore

25 existed pre-petition, was deemed to have arisen post-

1    petition, and that's --

2              THE COURT:  Really?

3              MR. APPLEBAUM:  Yes.  That's the <u>Sigel</u> case out of

4    the 9th Circuit, as well as the <u>Sure-Snap</u> case, I think out

5    of the 11th Circuit, and I can give you cites on those pretty

6    quickly, but --

7              THE COURT:  That sounds totally wrong to me.

8              MR. APPLEBAUM:  It's the concept of returning to

9    the fray, Your Honor, when you have a non-executory contract

10   and then you take some action that triggers liability.  You

11   voluntarily do it, as opposed to a traditional continent

12   indemnification claim, which is based on some extrinsic

13   conduct beyond the third -- beyond the debtor's control.  And

14   that's the difference between when a claim is deemed to be

15   contingent pre-petition claim versus a claim that actually

16   arises in the future.

17             THE COURT:  But this debtor isn't going to be

18   taking any voluntary action that would trigger a claim in the

19   future.

20             MR. APPLEBAUM:  Exactly.  Even though that's

21   correct, but the buyer will be.

22             THE COURT:  The buyer isn't a party to the

23   contract.

24             MR. APPLEBAUM:  That's correct, Your Honor, but

25   the point is that the debtor should not be able to do, in

1   Section 363, what it could not do in Section 1141.

2   So if Mr. Abbott is correct and the agreement is

3   non-executory, cannot be assumed and assigned, then black

4   letter bankruptcy law is they would normally ride through a

5   Chapter 11 bankruptcy process.  So --

6   THE COURT:  Ride through is a whole different

7   concept, the whole different concept which I'd have to -- and

8   complicated, in my view, which I'd have to think about.

9   MR. APPLEBAUM:  It is complicated, Your Honor, but

10  the -- but it's -- in application, it should work the same.

11  THE COURT:  But it rides through when you have a

12  reorganized debtor.  That concept came in -- I first came to

13  know that concept in a joint venture partnership.  I can

14  preclude you from taking this contract and so the debtor says

15  well, I'm going to let it ride through.  Ride -- how does

16  ride-through work in a non-reorganized context?

17  MR. APPLEBAUM:  Your Honor, I think the answer to

18  that, and I don't have a case to support it, but I think the

19  answer to that in a sale context is that ride through means

20  that it rides through with the asset that it - - that it's

21  connected to.

22  THE COURT:  Oh, that can't be right.  That -- wow,

23  I'd have to have a case for that.  Ride-through concept is

24  the idea that the contract is still in place but it would be

25  in place with the debtor.  How could it be in place with a

1  party who's not a party to it?  How can that be?

2         MR. APPLEBAUM:  I think the answer to that though

3  is, Your Honor, that the debtor should not be able to

4  accomplish through a 363 sale what it could not accomplish

5  through a reorganization.

6         So if the buyer -- sorry.  If the debtor in a

7  reorganization would remain obligated for future obligations

8  under a non-executory contract because that contract rides

9  through it should not be able to create a different result by

10  selling the underlying asset when the buyer is going to take

11  those exact same actions, engage in that same conduct, that

12  would give rise to those same obligations but now because,

13  you know, those become obligations of the debtor who no

14  longer has the asset.

15         THE CORUT:  But couldn't the debtor just reject

16  it?

17         MR. APPLEBAUM:  No, Your Honor.  They can't reject

18  it because it's not an executory contract.

19         THE COURT:  But you're telling me it's executory,

20  so couldn't -- and the ride-through concept, as I understand

21  it, comes in the context of executory contracts which the

22  debtor cannot assume because of West Electronics, our case

23  out there that many people disagree with.

24         So -- but that's how I've seen that concept used.

25  But if it's executory as you say it is, then the debtor is

1   going to reject it and then there's not an 1141 issue, right?

2          MR. APPLEBAUM:  That's right.  And if -- I was

3   taking Mr. Abbott's argument which is that he's arguing that

4   it's non-executory and there's a ride-through doctrine on

5   non-executory contracts.

6          THE COURT:  He's going to reject it now but there

7   couldn't -- yeah.  That's more than I can figure out sitting

8   up here on the bench.

9          MR. APPLEBAUM:  Your Honor, just going back

10  briefly to the chain of title issue, the concern here, and

11  again, we would request the opportunity for post-hearing

12  briefing and I can -- there's a timing issue there under the

13  debtor's sale motion.  They have until September 25th to

14  close.  Today's only the 11th.  There's ordinarily a 14-day

15  stay under Rule 6004(h).  They haven't put on any evidence

16  today as to why they need to close sooner than 14 days.  The

17  only statement in the motion I think is that they say, "The

18  debtors believe that any sale shall be consummated as soon as

19  possible to preserve the maximized value."

20         But there's no evidence before the Court as to why

21  they need more time than the 14 days ordinarily afforded by

22  Rule 6004 and their sale motion says they have until the

23  25th.

24         So we would ask that there not be a waiver under

25  Rule 6004; that the normal 14-day stay apply, which would

1    give us the opportunity to submit some additional briefing on

2    the state law issues regarding chain of title so that we can

3    get that in front of Your Honor as quickly as possible and

4    they could still close within the time frame that they need

5    to.

6          And then the only other point that I just wanted

7    to make, Your Honor, is -- and I appreciate the Committee's

8    perspective that a sale is better than no sale but --

9          THE COURT:  Either this can happen or it can't.

10          MR. APPLEBAUM:  But the impact on unsecured

11    creditors, if this obligation is not taken, not honored by

12    the buyer for future -- I mean, certainly, if it's not an

13    executory contract and they don't have to cure the $1.2

14    million pre-petition amount, that's an obligation of the

15    estate.  But if they're also given carte blanche to continue

16    manufacturing and selling Rhofade going forward without

17    honoring the royalty, then that's an additional claim that

18    will have to be valued and will significantly eat into and

19    dilute the unsecured creditor's claim pool here.

20          So I think that the impact on unsecured creditors

21    is not as negligible as it may be -- that is being argued by

22    the debtors.

23          THE COURT:  Yeah.  I mean it's the claim that it

24    is and that would have to be determined.

25          MR. APPLEBAUM:  Yeah.  So, Your Honor, I'll close

1    there.  Again, our request is that if Your Honor is otherwise

2    inclined to approve the sale, we would ask that the normal

3    14-day stay remain in place and that we would appreciate the

4    opportunity to submit additional briefing on the chain of

5    title issue under state law.

6                    THE COURT:  Thank you.

7                    MR. APPLEBAUM:  Thank you, Your Honor.

8                    MR. ABBOTT:  Your Honor, may I respond just very

9    briefly?

10                   THE COURT:  Um-hum.

11                   MR. ABBOTT:  I don't know where ride-through came,

12   Your Honor, into this equation.  It's not in any of the

13   papers.

14                   THE COURT:  Uh-uh.

15                   MR. ABBOTT:  It has no application in this context

16   --

17                   THE COURT:  I didn't think so.

18                   MR. ABBOTT:  -- in my view, and we can talk about

19   mortgage, contracts, and agreements.  I'm going to cite to

20   Your Honor, language from this Court, Judge Walrath, in 2002

21   in the In Re:  Waste Systems case, 280 B.R. 824, 827, 828.

22   It's a royalty discussion, Your Honor.

23                   Judge Walrath writes, Gave asserts that the

24   royalty payments do under the consulting agreement or post-

25   petition administrative claims because the payments arise

 1  only after WSI delivers waste to the First Street facility.

 2  We disagree.  The obligation to make the royalty payments

 3  arose when the consulting agreement was executed pre-

 4  petition, citing, In Re:  M Group, 268 B.R. 896.

 5          THE COUT:  Yeah, I lost that case, M. Group.  I'm

 6  familiar with that case.

 7          MR. ABBOTT:  Maybe I went a sentence too far, Your

 8  Honor.

 9          But, Your Honor, in short, it's not a springing

10  obligation.  It's an obligation that was baked into the asset

11  purchase agreement.  If I said to Mr. Applebaum, well, when

12  did the debtors commit to pay that amount, he can only say

13  when they signed the asset purchase agreement, which

14  indisputably happened pre-petition, Your Honor.

15          As to delaying for further briefing, Your Honor,

16  they've had ample chance to articulate whatever theory they

17  want to articulate and when they suggest, Your Honor, that we

18  don't have to close until September 25h, so Your Honor has

19  time to consider all their papers and rule later, what they

20  fail to understand is that a final order is a closing

21  condition that has to be meet; that that can't happen if the

22  Court doesn't enter an order approving the sale.

23          So, with that, Your Honor, I'll rest, but I would

24  ask the Court to overrule the objection and approve the

25  sales.

1          THE COURT:  Okay.  Thank you.  Mr. Hogewood?  You

2  have something to say about the 14 days?

3          MR. HOGEWOOD:  I do.  We affirmatively negotiated

4  for the provisions eliminating the 14-day stay and we intend

5  to close within the week, if possible, and certainly early

6  next.

7          THE COURT:  Thank you.  Okay.  I want to get my

8  thoughts together before I rule because there have been a lot

9  of moving parts to this.

10          But let me ask -- the sale to Ligand, let's talk

11  about that for a moment.

12          MR. ABBOTT:  Yes, Your Honor.

13          THE COURT:  We have no objection to that?

14          MR. ABBOTT:  There are no outstanding objections

15  to Ligand.  They have made a number of changes.  We've

16  resolved an awful lot of objections, including those of the

17  United States and the U.S. Trustee.  I know the U.S. Trustee

18  I think has some language in the order issues and that order

19  is still a bit of a work-in-process.

20          THE COURT:  Okay.

21          MR. ABBOTT:  But I don't believe there's any

22  substantive objection to the sale to Ligand of the assets

23  that it's intending to purchase.

24          THE COURT:  Okay.  Let me hear if there are any

25  objections to the sale to Ligand.  Ms. Casey?

1          MS. CASEY:  Good morning, Your Honor.  Linda

2  Casey, on behalf of the U.S. Trustee.

3          As debtor's counsel stated, I don't object to the

4  sale itself, but I do have some comments to the proposed sale

5  order.  I don't know if you'd want to hear them now or when

6  -- I don't know what negotiations are going on to continue

7  it, but I do have a couple comments on the sale order.

8          THE COURT:  Okay.  Well, Mr. Abbott, what's your

9  thought with respect to when that order will be final for us

10  to look at?

11          MR. ABBOTT:  Your Honor, I think we can probably

12  do it while the Court is considering the arguments its heard.

13  I assume the Court wanted to take a break for a half-hour or

14  something and work through things.

15          THE COURT:  Um-hum.

16          MR. ABBOTT:  We'll use that time productively here

17  to get Ms. Casey's comments and try to get those orders in as

18  final shape as we can.

19          THE COURT:  Okay.  Thank you.  Anyone else on

20  Ligand?

21          MR. GOELLER:  Good morning, Your Honor.  Matthew

22  Goeller, from K&L Gates.

23          I rise just to introduce my colleague, Brandy

24  Sargent, on behalf of Reedy Creek.

25          THE COURT:  Thank you.

1          MS. SARGENT:  Thank you, Your Honor.  Brandy

2    Sargent, on behalf of Reedy Creek.  We had a limited

3    objection to the sale to Ligand, which has been resolved

4    through language in the order and also through an assumption

5    agreement which is pending signature right now.

6          THE COURT:  Okay.  Thank you.  Anyone else?

7      (No verbal response)

8          THE COURT:  Okay.  I am going to take about half-

9    an-hour to gather my thoughts, so we're in recess.

10          MR. ABBOTT:  Thank you, Your Honor.

11      (Recess taken at 11:32 a.m.)

12      (Proceedings resumed at 12:24 p.m.)

13          THE COURT:  Please be seated.  Okay.

14          The issue before me is whether to approve two

15    sales of debtor's assets, which occurred after an auction and

16    a bidding process.

17          The only objection is to the one sale to Mayne.

18    The objection was filed by Aclaris and it deals with the

19    Rhofade assets.

20          Before I get into that specific objection though,

21    let me make the more general findings that I need to make

22    with respect to the sale and the process itself.

23      I find, based on the testimony of Ms. Stafford and the

24    Declaration of Mr. Wein that the sale process itself

25    proceeded in a fair manner, that it was noticed

1 appropriately, that the process that was followed followed

2 the auction procedures that were entered by this Court; that,

3 while they didn't -- procedures did not result in an actual

4 auction, the opportunity for bidding and the potential for an

5 auction was there.

6        Ms. Stafford testified undisputed that, while she

7 had hoped for greater proceeds resulting from the process,

8 that the process itself was vigorous at arm's length; that

9 the asset purchase agreements were negotiated fairly; that

10 she believes at this point that the robust process resulted

11 in the best and highest consideration for the two sets of

12 assets that were subject to the agreement.

13        Neither buyer here is an affiliate of the debtor

14 or an insider and there is no question with respect to the

15 good faith of the debtors or either purchaser during this

16 process.

17        Further, I conclude, based on the evidence that's

18 been submitted, that there is a reason to sell the assets at

19 this point in time and outside of a plan of reorganization

20 and I note that no party has objected to that and the

21 Committee is in support.

22        I will comment that, as debtor's counsel noted,

23 the procedures here, the auction procedures here, were a bit

24 unorthodox yet, even today, which is now -- I don't know

25 exactly how many weeks into this case, but I want to say

1   almost two months into this case, no party has come forward

2   to say that they were chilled from the bidding with respect

3   to the process that was put in place.

4          So, absent the one objection that we have with

5   respect to the sale to Mayne, I conclude that the sale

6   process itself was appropriate and I would approve the sales.

7          Now let me deal directly with the objection that's

8   been raised by Aclaris.

9          Aclaris objects to the sale of the Rhofade assets

10  to Mayne because the royalties that Aclaris may be owed on

11  future sales of Rhofade is an excluded liability under

12  Section 2.4(k) of the asset purchase agreement among Novan,

13  EPI, and Mayne.  Specifically, the agreement provides that

14  excluded liabilities include liabilities arising under that

15  certain asset purchase agreement dated October 10, 2019

16  between EPI and Aclaris.

17         Coming into this argument, I thought the issue was

18  whether the Aclaris agreement was executory or not and/or

19  whether the contract was being sold under Section 363 to

20  Mayne and what the consequence of that was.  But that is not

21  the issue before me.

22         Both the debtors and Mayne have confirmed that the

23  Aclaris agreement is not being assumed or assigned -- and

24  assigned under Section 365 or sold under Section 363.  In

25  other words, again, the Aclaris agreement is an excluded

1  asset.

2          The issue now raised is whether the assets being

3  sold can be sold free and clear of the debtor's obligations

4  in the Aclaris agreement, and specifically the royalty

5  payments.

6          Having reviewed the Aclaris agreement and having

7  heard arguments of counsel, the Aclaris contract is itself an

8  asset purchase agreement; again, dated October 10, 2019, and

9  under that contract, Aclaris sold outright to EPI all of

10  Aclaris' right, title, and interest to the assets listed in

11  that agreement.

12          The argument before me is premised on the fact and

13  proceeded on the fact that the Rhofade assets were among

14  those assets sold to EPI under that agreement.

15          As the debtor argued, both the contract itself and

16  the bill of sale assignment and assumption agreement executed

17  by Aclaris and EPI evidence an outright sale.

18          In exchange for the transferred assets in that

19  outright sale, Section 3.1 of the Aclaris agreement, debtors

20  agreed to pay, as consideration, a purchase price which was

21  an upfront payment of $35 million, a payment for inventory,

22  an earn-out payment of certain sale milestones -- if certain

23  sale milestone events occurred, and certain royalties on both

24  U.S. and non-U.S. sales.

25          Aclaris argues that the Rhofade assets cannot be

1    sold free and clear of its royalty interests because the

2    Aclaris contract is "an indispensable element in the overall

3    chain of title that Mayne must acquire in order to acquire

4    the Rhofade asset."

5          Aclaris cites to no case law for this proposition,

6    bankruptcy or non-bankruptcy, nor does Aclaris argue that the

7    Aclaris agreement did not transfer the Rhofade assets to EPI,

8    nor could that argument be made given what I've just

9    discussed.

10          Aclaris looks to the Mayne APA, specifically

11    Section 3.6(a), which lists material contracts, but that does

12    not support Aclaris' argument.

13          Section 3.6 of the contract, the Mayne APA, is in

14    the seller's representation and warranty section of that

15    contract and sets forth "a true and correct list of contracts

16    by which seller is bound."

17          Even within Section 3.6, there is a distinction

18    between material contracts and assumed contracts and the

19    Aclaris contract, again, is not on the assumed contract list.

20          The Aclaris agreement is a material contract under

21    -- or listed in the Mayne APA but it is not an assumed

22    contract.

23          Aclaris relies on Weinstein, the 3rd Circuit

24    decision, but that does not assist Aclaris either.  In

25    Weinstein, the contract at issue was sold to the buyer and

1  the question was what was the effect of that.

2          Here, the contract is not being sold to the buyer.

3  So even assuming what is, at best, dicta, that the buyer of a

4  non-executory contract must satisfy certain obligations,

5  that's not relevant here.  This contract is not being sold.

6          <u>Waste Systems</u> is more on point.  There, Judge

7  Walrath had determined, decided, ruled, that royalty payments

8  arise when the agreement was executed.  It's here, clearly,

9  part of the consideration that was given for this particular

10  contract.  There is no suggestion in the contract, the

11  Aclaris contract, that this debtor obligation, the payment

12  consideration, somehow rides through the contract, moves with

13  the contract, or is part of any chain of title.

14          What will happen next with the Aclaris contract

15  will be determined as we proceed through these cases but it

16  is not being assumed and assigned today and it is not being

17  sold today.

18          So I will approve the sale.  I will overrule the

19  objection.

20          And I am not staying the effect of the order for

21  any period of time.  I don't recall that being a specific

22  objection in the Aclaris multiple filings and the -- I did

23  not check this but it's been represented to me that a final

24  order is a condition precedent to closing and we have to

25  close this month.

1          MR. ABBOTT:  Thank you, Your Honor.  I do have

2     forms of the two sale orders.  I don't know if the Court's

3     got comments to those or wants to walk through them.  We can

4     -- we've made some revisions, though I think to resolve Ms.

5     Casey's issues and others, and I don't think there's any

6     outstanding issues, but if the Court wants to walk through

7     them, I can hand up I think blacklines of each of them.

8          THE COURT:  I will confess that, given the flurry,

9     I think was your words of filings that hit me over the

10    weekend, I haven't had a chance to really concentrate on the

11    sales order, but that's going to work to your benefit.  I'm

12    going to assume that those who had an interest have

13    identified any paragraphs they had an interest with, an issue

14    with, and it's been resolved and I understand all the

15    objections have been resolved.

16         So I guess I'd like to understand Ms. Casey's

17    changes, but, other than that, I'll be fine with the orders.

18         MR. ABBOTT:  Your Honor, the change Ms. Casey

19    requested was simply to remove language that suggested the

20    assets were being sold free and clear of recoupment rights so

21    those have been stricken from both of the orders.

22         THE COURT:  Okay.

23         MR. ABBOTT:  And I think that's that.

24         THE COURT:  Thank you.

25         MR. ABBOTT:  She had one other comment that we

1  pushed back and we ultimately agreed to disagree some other

2  time, but not in this case, so.

3          THE COURT:  Okay.

4          MR. ABBOTT:  So I think we're done and I don't

5  believe there's any other objection to the forms of order,

6  Your Honor.

7          THE COURT:  Very good.  Anyone else want to be

8  heard on that?

9      (No verbal response)

10          THE COURT:  Okay.

11          MR. ABBOTT:  Your Honor, we will go back -- we've

12  got to attach the APAs, et cetera.

13          THE COURT:  Yes.

14          MR. ABBOTT:  And we'll get those attached and

15  upload them and alert chambers when that's done.

16          THE COURT:  Thank you.

17          MR. ABBOTT:  Your Honor, I believe that is all for

18  today.

19          THE COURT:  Okay.  Thank you then.

20          MR. ABBOTT:  Thank you, Your Honor.

21          THE COURT:  We're adjourned.

22      (Proceedings concluded at 12:38 p.m.)

23

24

25

1                              CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Tammy Kelly                        September 18, 2023

8    Tammy Kelly

9    Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25