**SO ORDERED**

**SIGNED this 4 day of April, 2024.**

_____
Pamela W. McAfee
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

9 METERS BIOPHARMA, INC.,

DEBTOR

CASE NO.
23-01992-5-PWM
CHAPTER 7

**ORDER**

The court heard oral argument on the Motion to Enforce Sale Order filed by Helicore Bioventures I, Inc., D.E. 185, on March 26, 2024, and rendered its decision from the bench during a videoconference hearing on April 3, 2024. This order memorializes the bench ruling, with only non-substantive typographical corrections and complete citations added, together with generalized headings for ease of reference.

**BENCH RULING**

The court heard oral argument on this matter on March 26, 2024 and will now announce its decision, which will be followed by a written memorialization of the bench ruling, subject to non-substantive corrections to typos and citations.

The matter before the court is the motion of Helicore to enforce this court's sale order. For the reasons that follow, the motion will be allowed.

**Procedural Background**

By way of background, and as relevant to the matter before the court, the debtor, 9 Meters Biopharma, Inc. filed a petition for relief under chapter 7 of the Bankruptcy Code on July 17, 2023, and George Sanderson was appointed chapter 7 trustee.

Among the debtor's assets are a license agreement entered between Lobesity, LLC as licensee and MHS as licensor, which was purchased from Lobesity by the debtor pursuant to an Asset Purchase

Agreement dated July 2021. The MHS License Agreement was described by one attorney as the "crown jewel" of the debtor's "NM-136 assets."

On November 2, 2023, the Trustee filed a motion, among other things, to approve bidding procedures for the sale of the debtor's "NM-136 assets" free and clear of liens and to approve Helicore Bioventures I, Inc. as stalking horse bidder. That matter was scheduled for hearing on November 16, 2023. An objection was filed by Lobesity, LLC, indicating first that Lobesity was aware of another entity, Incregen Therapeutics, LLC, that was willing to serve as the stalking horse bidder for all of the debtor's assets, and second, that an incurable default may exist under the Lobesity APA, the agreement through which the debtor obtained its rights to the assets to be sold, and reserving its rights related to the assignment of the MHS License Agreement that is at issue today.

At the hearing on November 16, 2023, the trustee requested an opportunity to evaluate the Incregen competing bid, and the hearing was continued to November 28, 2023. Also at the November 16, 2023 hearing, counsel for Lobesity indicated that some of the people involved "on their side" – which the court interpreted to mean Lobesity and Incregen -- were former executives of the debtor, including its chief medical officer.

The trustee filed a new motion to approve bidding procedures and stalking horse bid on November 27, 2023, substituting Incregen as the stalking horse bidder. At the hearing on November 28, 2023, the same counsel appeared on behalf of both Incregen and Lobesity. Helicore raised a concern about the affiliation between Incregen and Lobesity, noting that the assumption and assignment of the Lobesity APA, including any cure amount, would be a major negotiating point, and that the relationship between the stalking horse bidder and the counterparty to that agreement, Lobesity, could put other bidders at a disadvantage. In an effort to buffer any unfairness in negotiating any cure amounts, it was decided that the negotiation of cure amounts with Lobesity would take place without the input of Incregen, who was otherwise entitled, in its capacity as the stalking horse bidder, to be consulted in the negotiation of cure amounts.

In the context of discussing that issue, the court observed multiple times that there is an inherent obligation for the parties to proceed in good faith, and that if Lobesity acted other than in good faith with respect to the assignment of its agreements should Incregen not be the winning bidder, the court would address that problem on the back end.

Counsel for Lobesity and Incregen commented that there might be a "legal" issue, rather than a "cure issue," but there was no further elaboration.

Thereafter, the bidding procedures were approved and deadlines established for objections to the sale procedures and proposed cure amounts for the potential executory contracts to be assumed and assigned. Lobesity retained new counsel, so that it and Incregen moved forward with separate counsel. Lobesity, on behalf of itself and "on behalf of MHS Care-Innovation LLC," submitted a limited objection and reservation of rights to the trustee's motion to assume and assign the Lobesity APA and MHS License Agreement, arguing that through the Lobesity APA, the debtor assumed Lobesity's rights and obligations owed under the MHS License Agreement. The objection asserted that the debtor was required to make milestone and royalty payments to Lobesity under the

Lobesity APA but did not assert any specific obligation owed under the MHS License Agreement. The objection further disclosed that MHS was the majority equity holder in Lobesity, so that MHS had a significant interest in ensuring that the debtor's and any assignee's obligations to Lobesity were enforced. There was no discussion of any obligations of the debtor or any assignee to MHS.

The auction was conducted, with Helicore emerging as the successful bidder for the NM-136 assets. The trustee filed a notice of executory contracts that were potentially subject to assumption and assignment and the proposed cure amounts. Lobesity, again on its behalf and on behalf of MHS, filed an objection to the notice of the winning bid and to the assumption and assignment of the Lobesity APA and the MHS License Agreement on the same general bases as the prior objection and asserting that Helicore had not provided adequate assurance of future performance with respect to the completion of certain trials and milestones set out in the Lobesity APA. There was no reference to the asserted performance obligation now before the court, notwithstanding that the objection noted that an assignee is required to provide adequate assurance of its ability to perform "material and economically significant contract terms." At that time, only the obligations under the Lobesity APA, not the MHS License Agreement, were identified.

In his response to Lobesity's objection and reservation of rights, the trustee contended, among other things, that MHS had waived any objection, as it had not filed a timely objection to any matter related to the sale. The trustee questioned Lobesity's authority to object on behalf of MHS, and noted that counsel for Lobesity had not entered an appearance for MHS and there was otherwise no indication that MHS had authorized the position taken by Lobesity. The trustee also disagreed with Lobesity's legal position with respect to the assumption and assignment of the contracts.

Ultimately Helicore and the trustee requested approval of the sale and assumption and assignment of the MHS License Agreement, but NOT the Lobesity APA.

Lobesity's objection and reservation of rights was withdrawn prior to the final sale hearing, and the sale order was entered on January 5, 2024, without objection. The sale order, which attached the asset purchase agreement between the debtor and Helicore, approved the Helicore asset purchase agreement, authorized the sale of the debtor's NM-136 assets free and clear of all encumbrances, and authorized the assumption of certain executory contracts. The sale order also explicitly provided that the Lobesity APA was NOT being purchased/assigned, but that the MHS License Agreement was being assigned with a cure amount of zero dollars.

The sale closed on January 10, 2024. On January 12, 2024, MHS, through counsel, sent an email to counsel for Helicore asserting that MHS intended to enforce its rights to Helicore's obligation to satisfy certain payments, milestones, and license payments in the Lobesity APA, and to enforce its rights as to Helicore's obligation to provide MHS with equity, rights, and privileges afforded under section 4.1 of the MHS License Agreement that Helicore had assumed.

**Matter before the Court and Summary of Issues**

The motion now before the court asserts that the email demand purported to require Helicore to perform under the Lobesity APA, an agreement that had explicitly not been assumed and assigned to Helicore, and to require Helicore to issue equity and other rights to MHS in violation of the sale order. The motion further asserts that the email was a demand for a cure payment that is not owed and that is not required by the Helicore APA or the sale order.

In its response, MHS withdrew the portion of its demand related to the payments, milestones, and license payments it asserted were required by the Lobesity APA, but it maintains that it is entitled to enforce section 4.1 of the MHS License Agreement as a post-assignment condition precedent to its performance obligations. That provision reads, "License Costs. Licensee acknowledges that Licensor was provided with certain equity, rights, and privileges set forth in the LLC Agreement."

Substantively, MHS first contends that the only matter before the court is one of contractual interpretation under Ohio law that this court lacks jurisdiction to consider. On the merits, MHS maintains that section 4.1 is a post-assumption obligation under the MHS License Agreement that is not addressed by the sale order. Because the MHS License Agreement references the Licensee's assignees, MHS contends that section 4.1's reference to Licensee includes the original licensee, which was Lobesity, and any successor assignees, such as debtor 9 Meters and now Helicore, as being required to provide certain equity, rights, and privileges. Of note, the Lobesity LLC Agreement granted majority equity and 4 of 5 board seats to MHS; in other words, controlling membership and management of the initial Licensee.

**Jurisdiction**

The court turns first to MHS's contention that this court does not have jurisdiction over this matter, because, as MHS describes it, this is a "run of the mill breach of contract issue" that does not involve the sale order but only the interpretation of the contract that was assumed by Helicore under the Helicore APA. The court is not persuaded. To the contrary, the court has no difficulty concluding that it does have jurisdiction to consider the motion to enforce the sale order, for several distinct reasons.

First: Paragraph 43 of the Sale Order provides, in relevant part, that "The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions under this Agreement, . . . and any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to . . . interpret, implement, and enforce the provisions of this Order and the Purchase Agreement, including but not limited to the injunctions and limitations of liability set forth in this Order," "protect the Buyer against any Claims and Interests in or against . . . the Purchased Assets of any kind or nature whatsoever," . . . "enter any orders under sections 105, 363 and 365 of the Bankruptcy Code with respect to the Purchased Assets and the Assigned Contracts;" decide any disputes concerning the rights and duties of the parties under the order or purchase agreement, "the status, nature and extent of the Purchased Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Claims and Interests;" . . . and adjudicate any and all disputes concerning alleged pre-closing

Claims and Interests in and to the Purchased Assets including the enforceability of any and all such alleged Claims and Interests.

Clearly the retention of jurisdiction in the sale order encompasses the dispute now before the court.

In addition, that retention of jurisdiction falls well within the statutory limitations on bankruptcy jurisdiction.

The sale order was entered pursuant to section 363 of the Bankruptcy Code. Within that sale order are provisions related to the assumption and assignment of certain contracts pursuant to section 365 of the Bankruptcy Code. To evaluate the motion before the court, the court must determine what assets and liabilities were sold, and what obligations had to be fulfilled for certain contracts to be assumed and assigned. Not only is there very clear law that a bankruptcy court always has authority to interpret and enforce its sale orders, but the issues that must be considered in this case necessarily "arise in" a case under title 11 and "arise under" title 11. Sales free and clear of liens and interests, and the ability to assume and assign contracts, are uniquely bankruptcy procedures not available outside of the bankruptcy context.  In addition, an analysis of what rights and obligations the debtor had – and sold -- requires determination of property and liabilities of the estate. This too arises in and arises under the Bankruptcy Code and necessarily is related to the chapter 7 case of 9 Meters.

The court is supported in its conclusion that it has jurisdiction and authority to review and determine the matter raised in the motion by, for example, the decisions in *In re Motors Liquidation Company*, 829 F. 3d 135, a 2016 case out of the Second Circuit, and by *In re SS Body Armor I*, 2012 WL 2315177, a June 7, 2021 decision by the Delaware Bankruptcy Court, citing the Supreme Court's 2009 *Travelers Indemnity v. Bailey* decision, at 557 U.S. 137.[1] The authority on this point runs deep and it is consistent – those cases are but the tip of a jurisdictional iceberg with respect to interpretation and enforcement of sale orders.

So, in the appropriate contexts, a bankruptcy court in fact MAY have jurisdiction over a contract dispute, even a "run of the mill breach of contract issue," as MHS characterizes the issue before the court.  The court does not see the dispute here as typical or run of the mill at all, and in fact, the court's primary concern at present is not only the specifics of an alleged contract dispute, but also MHS's apparent attempt to either avoid or undo this court's sale order while insisting that it is not attempting to do so, coupled with its assertions that the court lacks jurisdiction to even determine what precisely has happened and is happening here.

In summary, the court must interpret its sale order to determine whether the obligation that MHS asserts falls within a defined "interest" of which the assets were sold free and clear, or whether there is any argument that the obligation was a liability expressly assumed by Helicore. The court certainly has jurisdiction to consider those matters. To make those determinations, the court must first construe what the obligation is; thus, the court has jurisdiction to interpret the contractual provision as well.

---

[1] *In re Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016); *In re SS Body Armor I, Inc.*, 2021 WL 2315177 (Bankr. D. Del. June 7, 2021); *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009).

**Substantive Issues**

The court next turns to Helicore's argument that the demand email is an effort to compel performance of an obligation that did not transfer or an effort to compel payment of a "cure" that was determined by the court to be zero, and, in contrast, MHS's argument that the demand email simply asserts a post-assignment condition precedent to MHS's performance obligation as Licensor and does not in any way violate the sale order, demand a "cure," or otherwise challenge the assignment of the MHS License Agreement.

The referenced language in section 4.1 of the MHS License Agreement reads "Licensee acknowledges that Licensor was provided with certain equity, rights, and privileges set forth in the LLC Agreement." In that context, Licensee was Lobesity, Licensor was MHS, and the LLC Agreement referenced was the LLC Agreement of Lobesity. The motion contends that this section contains no requirements and imposes no obligations on the assignee, Helicore, but it instead recites that consideration was provided for the original License Agreement between Lobesity and MHS – a mere recital that one element of a contract had been met, and therefore MHS's demand that Helicore provide equity, rights, and privileges was unfounded and also violated the sale order. As noted, MHS contends that it seeks only to enforce a post-assumption obligation for Helicore to provide the required consideration for MHS's performance as Licensor under the MHS License Agreement.

With that language in mind, the court turns to the relevant language of the sale order, which is plentiful:

Paragraph T of the findings in the sale order provides, in relevant part, first, that "the Trustee is the sole and lawful owner of the Purchased Assets, and no other Person has any ownership right, title, or interests therein," and that the Purchased Assets constitute property of the Debtor's estate and good title thereto is vested in the Debtor's estate," and second, that the transfer of the Purchased Assets to Helicore will be free and clear of any and all liens, debts, or "claims, liabilities, obligations, demand, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, . . . conditional sale or other title retention agreements and other similar impositions, imperfections or restrictions on transfer or use . . .," including claims that purport to give any party a right or option to effect any *profit sharing interest* or termination of the Buyer's interests in the Purchased Assets, or any similar rights, if any . . . with the exception of any interests that are expressly assumed by the Buyer. . . . "For the avoidance of doubt, the Buyer shall obtain the Purchased Assets free and clear of any . . . post-petition claim for royalties or other payments *or obligations of any kind whatsoever,* unless such claim is expressly assumed by the Buyer as Assumed Liabilities, or Cure Amounts arising under the Assigned Contracts."

It appears to the court that the language in section 4.1, if it is read as MHS contends it must be, would fall within several of the delineated interests in paragraph T: obligations, rights, restrictions, restrictions on transfer or use, and claims purporting to give a party a profit sharing interest in the Purchased Assets. Accordingly, unless it was expressly assumed, the MHS License Agreement was sold free and clear of the asserted interest.

6

MHS maintains that this provision was expressly assumed when Helicore assumed the MHS License Agreement, but MHS's argument fails in the face of Paragraph AA of the sale order, which reads, in relevant part:

> AA. No section of any of the Assigned Contracts that would prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assigned Contracts in connection with the sale shall have any force or effect.

MHS's argument is that section 4.1 is a condition to MHS's obligation, as licensor, to perform under the contract post-closing. This would directly or indirectly condition Helicore's use of the purchased asset, and as such that section is of no force and effect under the operative language in the sale order.

In addition, ordering paragraphs 26-30 of the Sale Order specifically address the Assumed Contracts, and provide, in summary, that:

> Upon the closing, the Buyer shall be fully and irrevocably vested with all right, title and interest of the trustee and the Debtor in and under the Assigned Contracts free and clear of any Claims or Interests, and each such assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions; that the Assigned Contracts shall remain in full force and effect for the benefit of the Buyer . . . and the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contract … , and that each Assigned Contract should be fully enforceable by the Buyer in accordance with its respective terms and conditions.

Accordingly, Helicore was vested with all of 9 Meters' right, title and interest in the MHS License Agreement and the license is fully enforceable by Helicore as it was by 9 Meters, a matter also addressed in the sale order.

Under the plain language of the Sale Order, the Trustee was vested with all right, title and interest of the Debtor, 9 Meters. There is no contention that 9 Meters owed some outstanding consideration to MHS for the MHS License Agreement. It is further clear that the Trustee held the interest to sell the MHS License Agreement independently of the Lobesity APA – if there were outstanding obligations under the Lobesity APA such that the MHS License Agreement was not vested in the debtor, that argument was either not raised and/or was withdrawn. The order provides that the estate held good title. Therefore, any condition had to be clearly stated in the MHS License Agreement and had to be an obligation *of the debtor* to which the buyer succeeded. But, the debtor was NOT required to provide any equity, rights, or privileges under section 4.1, and while MHS characterizes section 4.1 as an explicit condition, it is not and would not reasonably be read as such by a buyer.

While the court has determined that the sale of the MHS License Agreement was free and clear of the interest that is asserted by MHS, the court also finds that the interest is not what MHS claims it to be. The court still must determine what the provision does actually mean.

At the outset, it is easier to essentially work backwards and determine what section 4.1 cannot mean. MHS's interpretation of the contract cannot be squared with the language of the provision or applicable law, for several reasons.

> First, there is nothing to indicate that the clause is a condition precedent to performance, never mind one that must be met by each successor Licensee. Ohio law disfavors conditions precedent and will not find them unless there is an explicit intent of the parties to establish a condition precedent. See, for example, the 2007 *Evans v. Triad Architects* decision by the Ohio court of appeals, at 965 N.E.2d 1007.[2]

> Second, as noted by MHS, Ohio law requires courts to give meaning to every word in a contract. "Every word in a contract should be given meaning; no word should be construed as surplusage." *See Summitcrest v. Eric Petroleum*, a 2016 decision by the Ohio court of appeals, at 60 N.E.3d 807.[3] Here, the word "acknowledge" would be surplusage if the clause is intended to create a continuing requirement for future assignees, and the phrase is in the past tense. It refers to the operating agreement of a specific entity, Lobesity, and contains Lobesity's acknowledgment that MHS was provided with equity, rights, and privileges set out in that agreement.

> Also telling here is the absence of any reference to a similar obligation to future assignees. The MHS License Agreement itself recites that it is being entered in contemplation of the sale of Lobesity's assets, including the MHS License Agreement, to 9 Meters. Yet, there is nothing in the MHS License Agreement that spells out what will be expected from 9 Meters as consideration for the MHS License Agreement. Given that a change in licensee was specifically anticipated and not just a theoretical future occurrence, had the parties intended that any new licensee would be expected to provide equity and controlling board membership to MHS as a condition to the Licensor's performance under the License Agreement, the MHS License Agreement would have so stated.

> Third, the actual performance of the parties to the MHS License Agreement is inconsistent with section 4.1 being a condition precedent to performance by MHS. Upon the transfer to 9 Meters, that section was not enforced as to 9 Meters in the way MHS now argues it must be. The demand from MHS to Helicore initially insisted that it was entitled to "payments, milestones, and license payments" under the Lobesity APA, suggesting that the consideration paid by 9 Meters for the license was contained in the Lobesity APA, not in the MHS License Agreement. 9 Meters paid its consideration to Lobesity, not to MHS. And, in turn, Helicore paid its consideration to the estate of 9 Meters, not to MHS. To the extent anything else was required under the Lobesity APA, the sale order conclusively determined that the trustee had title to the MHS License Agreement to transfer to Helicore, and any argument to the contrary has been waived.

> This is consistent with the analogy advanced by Helicore, which itself is not quite on point but with some tweaks reflects the situation. Helicore compared the transaction to the sale

---

[2] *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 196 Ohio App. 3d 784, 965 N.E.2d 1007 (Ohio App. 2011).

[3] *Summitcrest, Inc. v. Eric Petroleum Corp.*, 60 N.E.3d 807 (Ohio Ct. App. 2016).

8

of a vehicle in exchange for equity in Buyer A. If Buyer A then resells the vehicle to Buyer B, the seller is not entitled to equity in Buyer B, because it has already been paid for the vehicle. If the equity in Buyer A turns out to be worth less than the vehicle, then that is simply the risk of an equity exchange, and does not entitle the seller to pursue additional consideration from Buyer B. The more apt analogy is that the vehicle is leased, but it is leased for one up-front exchange of consideration, and the transfer of the lessee's right to use the vehicle does not entitle the lessor to more consideration.

MHS's proffered interpretation of section 4.1 also would create an impermissible restriction on transfer, as only a buyer willing to cede control of its equity and management to MHS would be eligible to purchase the asset, if what is required is the same "equity, rights, and privileges" that were given by Lobesity in its LLC Agreement – which, as the court notes in its next point, is not clear.

Finally, the language of section 4.1, if it is to be enforced against any party other than Lobesity, lacks certainty. And here we zoom out, because the language lacks details necessary to qualify as an enforceable contract term. Instead it raises questions: what must be given? Of what value? By when? By whom? To whom? In fact, the court can't see how the language upon which MHS relies could be enforced *prospectively* against *any* entity because it lacks key components – price, timing, etcetera – required of any contract.

Courts generally attempt to interpret a contract to avoid a result which renders the contract illusory, and that is true under Ohio law as it is virtually everywhere else. See, for example, *State v. Taylor*, a 1948 Ohio State court decision at 79 N.E.2d 127.[4]  This was not problematic as to Lobesity, because it *acknowledged the price already paid*.  That is all that language does.

Because MHS's proffered reading is both inconsistent with the language used and the performance of the parties, the court rejects that interpretation and instead concludes that the meaning of this provision is to establish that the essential element of consideration for the MHS License Agreement had already been provided in its entirety to MHS in the form of equity, rights and privileges granted to MHS by Lobesity.

**Analysis of the Demand**

Finally, the court turns to the crux of the issue: whether MHS's demand violated a provision of the sale order and, if so, what action the court may take as a consequence.

Paragraph 21 of the Sale Order bars, among others, all Contract Counterparties to the Purchased Assets from "revoking, terminating, or failing or refusing to transfer any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets in connection with the Sale."

---

[4] *State v. Taylor*, 149 Ohio St. 427, 79 N.E.2d 127 (Ohio 1948).

Paragraph 30 of the Sale Order provides that "Each Contract Counterparty is forever barred and estopped from raising or asserting against Buyer any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts."

The demand that Helicore provide additional consideration to MHS before MHS will perform its obligations under the MHS License Agreement is both an effort to terminate the authorization to use the license and an assertion of a condition to assignment that was waived by MHS's failure to raise the issue prior to the sale. The action is barred by the terms of the Sale Order.

Paragraph 43 of the Sale Order provides that this court may implement and enforce the order by entering any orders with respect to the Assigned Contracts and to protect the Buyer against claims and interests in the Purchased Assets including, without limitation, injunctive relief. The language of paragraph 43 is broad, and incorporates, directly and indirectly, the relief requested by Helicore.

**Conclusion**

In conclusion, it is clear to the court that MHS is, through its demand email, in violation of the terms of the sale order, that MHS has no right to demand any payment, cure, or equity pursuant to section 4.1 of the MHS License Agreement against Helicore, and the MHS License Agreement is enforceable against MHS to the extent MHS has outstanding obligations. Pursuant to paragraph 43 of the Sale Order, this court has the authority to interpret and enforce that order, including the injunctions contained within it, and to protect the buyer against asserted claims and interests inconsistent with that order.

Accordingly, Helicore's motion to enforce the sale agreement is ALLOWED.  The demand email sent by MHS to Helicore on January 12, 2024 violates the court's sale order and is of no force and effect. MHS is directed to cease and desist from efforts to require Helicore to provide it with equity, rights and privileges under its asserted interpretation of section 4.1.

Helicore stated at the hearing that a finding that the demand email violated the sale order and is of no force and effect, along with an order that MHS cease and desist from asserting entitlement under section 4.1 of the MHS License Agreement, would sufficiently address the issues before the court, such that this order fully concludes the matter before it.

Finally, the court observes that it has the duty and obligation to ensure the integrity of sales through the bankruptcy system. It was apparent based on comments made by counsel in open court, and in the filings before the court as early as November 2023, that there might be efforts to interfere with the properly conducted procedures and auction, and the successful bidder, if the buyer was not the entity of MHS's choosing. That there would be some effort to frustrate Helicore was not just predictable, but predicted. The form that frustration would take was not known until the demand email was sent, which included as its second portion an issue that had not previously been raised by any party, notwithstanding that MHS's apparent interpretation of that clause would have been a substantial and material financial term of the agreement to which adequate assurance of future performance would have been a reasonable request.

This court simply cannot overlook the apparent effort to obfuscate and interfere with a bankruptcy sale. The implications for the health of the bankruptcy process and the debtors and outside parties who engage with it are obvious: few would buy assets through this process if they could be surprised post-closing with demands that were never raised prior to the purchase.

With that ruling, this matter is concluded.

**END OF DOCUMENT**